[No. 30283.   Department Two.   December 1, 1947.]

LENA GUARINO, *Respondent,* v. VINCENZO GUARINO, *Appellant.*[1]

*Geo. H. Crandell,* for appellant.

*R. A. Yothers* and *McCune & Yothers,* for respondent.

ROBINSON, J.—In this action, an interlocutory decree was entered granting a divorce to the defendant.  The trial court, valuing the tangible and visible assets of the community at nineteen thousand three hundred dollars, awarded property to the plaintiff of the value of seven thousand dollars, leaving the appellant in possession of property valued at twelve

[1]Reported in 186 P. (2d) 927.

thousand three hundred dollars. The only question presented by the appeal is definitely circumscribed by the following statement in the appellant's brief:

"From this judgment appellant appeals only from the order awarding the respondent $7000 insofar as the award was in excess of $2500."

The parties are of Italian lineage. Defendant, Guarino, was born in Italy in 1889 or 1890, and emigrated to the United States at the age of eighteen. The plaintiff was born in the United States. It is inferable that their marriage was arranged in accordance with Old World customs and usage. At any rate, the plaintiff was but thirteen years old at the time. The defendant was, by several years, more than twice her age. She had known him but one week, and in that brief period had seen him but three times. Shortly after the marriage, defendant, in partnership with some other Italians, bought a piece of land on contract near Bothell, Washington, and engaged in raising chickens and pigs. The child wife, according to her undisputed testimony, did the work of a grown woman.

"A. Yes. We had a thousand chickens, and we brought out quite a number of hogs, and we had a couple of cows. Q. What did you actually do yourself? A. Fed the chickens and took care of the egg part, and saw that the chickens had water, and all that stuff that you do on a farm. . . . Q. What did you do around the house? A. We had two houses to take care of there. I used to do the housework and cook for him, and take care of the animals because he used to go to the market and I used to have the whole responsibility of it there myself."

The partnership did not prosper in the pig and chicken venture. They changed over to the "moonshine" business. While that was being conducted, the plaintiff acted as a lookout. After the Bothell venture, which collapsed in about a year, the parties returned to Seattle and engaged in market gardening. In 1921, they purchased three quarters of an acre at 9620 Fourteenth avenue south for one thousand dollars and built a two-room frame house, supported on posts. It was unpainted and had no water connections. During the next seven years, a concrete foundation and basement were

constructed, several rooms added, and other improvements made. It was still the family home at the time of the trial of this action and was valued by the court at six thousand dollars.

(It may here be parenthetically noted that the testimony of a qualified real-estate appraiser that the home property could be sold for seven thousand five hundred dollars was not disputed by any other qualified witness. The care taken by the trial judge with respect to the division of the property of the parties is illustrated by the fact that he appraised it at six thousand dollars, on the theory that the then existing inflated real-estate market was not a true indicia of actual value.)

Shortly after the establishment of the home at that location, the Guarinos set up a roadside fruit and vegetable stand. Plaintiff testified as follows:

"Q. Who was responsible for running the vegetable stand? A. That responsibility was all on my shoulders. I had to go down in the garden and get my own vegetables and bring them up there and wash them and clean them and put them up there, and take care of all the customers that came in all during the day, and take care of my house besides. Q. Who raised the vegetables for sale in this stand? A. My husband used to take care of the vegetable part. I used to go down lots of time during the time that I had and weed and clean the vegetables so they would grow. I would go down there and pick them all the time, bring them up and wash them and put them on the stands. Q. What time of day would you open the stand? A. As soon as I got up. If I would get up at 7:00 o'clock, I opened it up. If I got up at 7:30, I opened it up, and would stay open until about 11:30, 11:00 o'clock. Q. 11:00 o'clock in the morning? A. At night. . . . Q. Was there anyone to help you in the running of the vegetable stand? A. My husband used to help in the mornings and on Sundays, and I was there practically all the time. Q. You didn't— A. I never hired anybody and paid wages out to help, no. Q. Was this vegetable stand open the entire year around? A. We would keep it open the whole year around provided it didn't get cold in the wintertime and potatoes and stuff would freeze. If it would freeze, we would close it maybe about two or three months in the wintertime. Otherwise we kept it open all the time. . . . Q. What did you do with the funds yourself when you got

them each day? What disposition did you make? A. Well, the money was always turned over to my husband. I never did have much say about money. I used to get it, and he used to come and take it out of the register, or I used to turn it over to him and he would keep the amount himself. I never did know exactly how much money we had, but I had a good idea. Q. Do you know what he did with the money then? Did he put it in the bank? A. No, he always kept his money out of banks. He had a very small account in a bank, but his money was always put around. Most of his money is put in fruit jars some place around that property right now. Q. During this period of time that you were working out there, were you working out there voluntarily? A. I was forced to go out there. He got himself a job and he was away from there; and when you have a business you have to get out and do it, and I had to get out and do it. I had to be outside when people come along, and I had to get the vegetables up there. I had to do all that. I just had to get out and do it. Q. Who took care of the children during this time, and the house? A. The children were out by themselves or out under my legs. Then a couple of years I had my sister out with me, and she took care of them there for a while when my last daughter was born. I stayed in bed five days, and I was up and out in that business right away after that. I was out there on the sixth and seventh day. He turned the business right back to me again and I had to keep on doing the same thing as I had been doing ever since we had been there. So I started to go down in the fields and picked up lettuce and cabbage and stuff like that, and I got a rupture, but there was no sympathy there. I had to just keep on doing it anyway."

(Two of the three children were born while respondent was operating the vegetable stand, the son in February, 1922, the youngest daughter in June, 1924. The oldest daughter was born in September, 1920, two days after respondent became sixteen years of age.)

There was no substantial denial or rebuttal of any of the above-quoted testimony, except the statement of the witness that: "Most of his money is put in fruit jars some place around that property right now." Defendant testified at the trial that he had only about two hundred dollars on hand at home. This may be true. Substantial amounts were taken

from the fruit jars during the three years prior to the trial of this action. The defendant himself so testified:

"Q. (by Mr. Yothers) Where did you keep this money, the $3000.00 that you loaned to Tony Colello? A. Inside the house. Q. How about the $4000.00? A. Inside the house. Q. How about the $3500.00 that you loaned to Dominick? A. I had it inside the house."

It is clear from the record that the trial judge, in making the property division, considered only such property as was tangible and visible. We quote from his memorandum opinion:

"I can't pass by the possibility that this defendant may very well have had, may even now have, a considerable sum of money that I don't know anything about; but we can't deal in uncertainties in distributing the estate. A man who will not deposit his money in the bank and conceals it in a can or some place about the home, and does that all through the years, never takes anybody into his confidence, not even his wife,—he didn't here. But I must deal with actualities and not with surmises."

The trial judge observed in his memorandum opinion: "There is a conflict here between two standards of living." The testimony so shows. It is probable that the defendant never learned to read or write his native language; at least, he testified: "I never went to school." It is certain that he never learned to read or write English. He never became an American citizen, nor did he become an American in spirit. During the first ten years of his married life at least, he lived the life of a typical Italian peasant, making his own wine, drinking two or three glasses of it at every meal, and hoarding every cent that came into his possession. Such changes as took place were the result of wider opportunity and of pressure exercised by his American-born wife and their American-born children. In 1929, Mrs. Guarino rebelled. Although appellant gives a different account of the matter, we think her testimony concerning it is sustained by the weight of the evidence:

"A. In 1929 things got so terrible there I couldn't stand it. My husband has always been a fellow that has never wanted to spend money or have an improvement on a place.

I had nothing in the house. He never bought me any clothes. I had to get out and earn everything that I ever had put on my back. If I wanted anything in the home I had to earn it. If I didn't earn it I just didn't get it. We lived in that house years and years, and there wasn't anything in it. I had no furniture. I had nothing on the windows. I had to get out and earn all that. He was always saying, 'Well, I'm broke. I have no money. I have no money.' Any time I would ask him for five dollars to buy groceries he would give me maybe a dollar and a half or a couple dollars. If I would ask him for a couple dollars he would put a dollar on the table."

The foregoing testimony may be, to some extent, exaggerated. There is testimony on both sides of this case which does not ring true, especially that of the youngest daughter and, to a lesser degree, that of the son. A study of the evidence given by several voluble neighbors leaves the impression that it was given in the belief that it is the bounden duty of a witness to uphold the hands of the party by whom he was summoned.

The chief conflict in the evidence is as to Mrs. Guarino's behavior after she left home in 1929, and as to whether she did anything for the community thereafter. It was charged that she was unfaithful to her husband after she left him in 1929. There is no evidence of any immoral, sexual act. However, the evidence is amply sufficient to support a finding that she was guilty of highly indiscreet and unseemly conduct. On that evidence, the trial court granted the divorce to the defendant. Since she does not appeal, we are not concerned with that phase of the case except in so far as it has a bearing upon the division of the property.

All the property was community property. Appellant's counsel contends that no division which gives the respondent property of the value of more than twenty-five hundred dollars can be regarded as just and equitable. This contention is based on two subsidiary contentions: (1) The value of the property which the community had in 1929, and still has, is not more than five thousand dollars; (2) on that date she completely abandoned the community, and has since contributed nothing thereto. Neither of these contentions is factually sound. The following statement taken from the

trial court's decision is amply supported by the evidence in the case:

"The husband confesses that he had $2000.00, I believe, which he loaned out at that time [1929]. At least he had $2,000.00 available, which is a part of the assets of this community very definitely. So if I continue with my valuation of $6,000.00 at the present time on the home, which includes, we will say for the moment, the furniture as well, plus the $2,000.00 would mean an estate of about $8,000.00 had been established by this couple in 1929."

She would, therefore, be entitled to at least four thousand dollars upon counsel's own theory.

As to the second contention, the evidence shows that the respondent did not permanently abandon the community, but continued to contribute to the community welfare in numerous ways right up to the time of the filing of the complaint in this action. After leaving the home in 1929, she served as a maid in a Seattle home for about eighteen months. She then returned and kept house for appellant and their children for two years. This was admitted by the appellant. Then, during a period of eight or nine years, she worked in Seattle at the Pike Place Vegetable Market, but lived at home. That also is admitted by appellant. We quote from his testimony given while under examination by his own counsel:

"Q. Did she ever stay away all night while she was working there at the Market? A. No. Q. She didn't stay away all night? A. No. Q. How long did that continue? A. Oh, for a long time. Q. About how many years? A. About six, seven years."

(This period must have been longer than that. All the witnesses agreed that respondent left home sometime in 1929, came back after eighteen months, kept house for the appellant for a period of two years, and then took day employment at a public market. This employment, therefore, must have begun at least as early as 1933. Respondent's testimony that she continued to live at home until 1942 was confirmed by several witnesses, and even by the appellant himself.) Concerning this period, respondent testified as follows:

"Q. Did you keep care of the house during that time? A. Oh, yes. I had all the washing and ironing to do on

Saturdays and Sundays when I was there. On my days when I didn't work out at the Market I was washing and canning. We have always done big canning out there. I used to do all that. . . . Q. What did you do with the wages, the salary, that you earned during the time you were employed on the Pike Market? A. Lots of times I used to buy stuff for the house and buy different clothes for the children. Q. What would you purchase for the house? A. Different curtains, pots, pans, dishes. Q. Did you purchase any furniture? A. I bought some parts of furniture like lamps and stuff that he wouldn't buy, extra things. He always said extra things weren't necessary, and I used to buy that kind of stuff. I bought blankets for those beds out there. I bought spreads for the beds out there. I wanted a pad for under the livingroom rug and he wouldn't buy that, and I bought that. That has all been accumulated with money that I have made in hotels and money that I made while I was out working on the Pike Place Market. There was a lot of things I bought my children, that they wanted. Q. What did you buy for the children? A. The youngest girl got a coat and a dress. My oldest girl got dresses, sweaters, skirts. My boy has gotten clothes from me all the time, pants, sweaters, shorts."

She further testified that she purchased school supplies for the children and periodically gave them money for their school bank accounts.

By 1942, respondent had quit working at the market and was working as a chambermaid at hotels. She again left the family home and took up residence in an apartment with a mother and daughter at 525 Columbia street, Seattle.

"Q. (By Mr. Yothers) That is the Breslyn Apartments? A. Breslyn Apartments. But I didn't actually just move out and stay out. On my days off I used to go out there and work. On my vacations I used to go out there and be out there the whole week. Q. By 'out there' you mean you would go back to the home? A. Back to the home. I used to take time off of my job and go out there after my oldest girl got married, and I used to clean house and wash and cook for him and do all the housework that a woman would do in a house. And I stayed there overnight with him all the time. I was in the same bed he slept in. . . . Q. (by Mr. Yothers) That arrangement continued up until when? A. The time I filed for divorce. Q. When was that? A. I filed for divorce just about a year now it will be, about the middle of May or April.

*Q. You had marital relationships with him during that time? A. All the time until I filed for divorce.* I haven't been out since I filed for my papers. I never did go out. . . . I don't work all the time. There is lots of times that I only work two weeks or three weeks out of the month. I was five years at the New Washington. I have been at the Olympic now for about a year; and it has been that way the whole six years that I have done that. I haven't worked steady at it." (Italics ours.)

That portion of the respondent's testimony, hereinabove quoted, which has to do with buying things for the house was challenged by the youngest daughter. The following is typical of her testimony:

"Q. Did your mother make any contribution or bring any of the things there to furnish the house with, after she started to work? A. She did bring a few things home, but my father gave her the money for it."

On cross-examination, she testified, in part, as follows:

"Q. You mean to tell the Court that she did not purchase any linen for the house within the last four years? A. If she did, my father paid her for it. Q. Do you mean to tell the Court that she didn't purchase any blankets from the New Washington Hotel? A. If she did, my father paid her for it. . . . Q. How many times did she bring blankets out? A. I don't know. Q. Did she bring them out more than once? A. I can't remember. Q. Did he pay her more than once for blankets? A. Yes. Q. How many times? A. I don't know that. Q. How many times did she buy drapes for the house? A. She bought them with my dad's money. Q. How many times did she buy drapes for the house? A. Once or twice. Q. Did he pay her for the drapes? A. Yes. . . . Q. Did she bring any groceries home? A. If she did, it was with my dad's money. Q. You are not answering the question. Did she bring any groceries home? A. Yes. Q. Did your father pay her for the groceries? A. He would give her so much money every week to buy the groceries with. . . . THE COURT: You are not on very good terms with your mother, are you? THE WITNESS: We don't argue. THE COURT: You heard my question? THE WITNESS: Yes. THE COURT: Are you or are you not on good terms with your mother? THE WITNESS: Yes, I am."

(No one disputed respondent's testimony to the effect that she had worked at the family home on her days off, on holi-

days, and after her day's work from 1932 until the bringing of this action in 1946.)

We are of the opinion that the testimony given by the oldest daughter is worthy of credit. She was very impartial. When it came to respondent's relationships with other men, she did not spare her mother in any way. She defended her father from her mother's accusations as to drunkenness, uncleanliness, and use of bad language. She partially corroborated her mother's testimony as to house furnishings and clothing for the children, and in various other ways. Speaking of the period during which her mother worked in town and came home nights, she said:

"She would come home on her day off and she would do most of the heavy work as I was not able to do it. Q. (by Mr. Yothers) What would she do? A. She would do the washing, and if there was curtains to be done she would do them, and, oh, most of the heavy work."

She further testified as follows:

"Q. What year was it that she stopped coming out there to the home? A. She came out there as long as I have been there. Q. When did you leave? A. I left in 1946. Q. What was the attitude of your father toward your mother during that period of time? A. Well, they would speak to one another. I wouldn't know how to answer that. Q. Did they resume their marital relationships? Did she stay there? Did she sleep with him? A. Yes."

Mrs. Swan, who resided in the apartment in which respondent lived at the time of the trial, and for several years prior thereto, was called as a rebuttal witness and testified, in part, as follows:

"Q. Have you ever been out to their home? A. I have. Q. Mr. and Mrs. Guarino's home? A. I have. Q. How often have you been out there? A. I wouldn't know the number of times I have been there, but possibly two weeks after I met her I went with her to her home on her days off—day off. And she went out and did the washing and the ironing, and scrubbed in the kitchen, and cleaned it entirely, and changed the bedding and everything; and she came back so as to be—work early 7:30 in the morning with us. Q. Did you go out with her any other time? A. Numerous times.

Q. What would she do on those occasions? A. Work.
Q. What sort of work would she do? A. Canning—"

At that point, appellant's counsel interposed an objection that this line of testimony was not proper rebuttal. The court so ruled, and the inquiry was dropped.

To some extent, respondent's testimony was corroborated by appellant. He admitted that his wife returned to him in 1932 and presided over his household for two years; that she then got a day job at the market, but was home every night for six or seven years (actually at least eight) until she rented an apartment in 1942, and that after that she came home two or three times a month.

"Q. Did she ever stay there more than one night [at a time] since 1941? A. Well, when my daughter had a child she stay one month. Q. She stayed for a month? A. Yes, each child. The last child, she stay three weeks. Q. And she lived with you then? A. Yes, sir. Q. She slept with you? A. Yes, sir."

Subsequently, he qualified this by saying: "Quite a number of times she been sleeping on the davenport and never come to sleep with me."

It is said in appellant's brief:

"(2) The appellant is a man of advanced years, 57. By the certificate of the doctor he is unable to follow the only type of employment he has known, to-wit, hard labor. His money earning days are over. The respondent on the other hand, 15 years his junior, enjoys normal health with the exception of suffering some temporary ill effects from the menapause. For 15 years she has pursued her own course absolutely independent of the community, earned her own way, spent her money as she saw fit, and her earning capacity is not impaired in the slightest. The respondent has 15 years of earning power without an obligation in the world. The respondent therefore is not in necessitous circumstances. The appellant on the other hand is without employment, unable to follow his usual vocation because of ill health, is entirely without earning capacity, and is without financial ability."

■ The relative physical condition of the parties is, of course, a material consideration in making a property division. Undoubtedly, the trial court had this in mind when he interrogated the appellant, as follows:

"THE COURT: How old are you? THE WITNESS: Fifty-seven. Fifty-six, excuse me. Be fifty-seven next June. THE COURT: How is your health generally? THE WITNESS: Pretty good. I been sick quite a while, by my kidneys, but I feel pretty good. I had kidney stone. THE COURT: A stone in your kidney? THE WITNESS: Yes. THE COURT: How long ago? THE WITNESS: Oh, it has been six, seven years; five, six years. THE COURT: That has passed away as far as you know? THE WITNESS: Yes, sir. I got the picture. They show clear."

■ The paragraph hereinabove quoted from appellant's brief is in many ways inaccurate, and is, in fact, primarily based upon a doctor's certificate brought up with the record, to the effect that appellant is not able to do heavy work. It is perfectly plain that, if the trial court ever saw this certificate, it was not until after the trial and, in fact, after the decree appealed from was entered and after this appeal was perfected. The trial was held early in February, 1947. The decree appealed from was entered on the following April 8th, the notice of appeal served on April 16th, and the appeal perfected by filing a cost bond on April 18th. The doctor's certificate relied upon is dated April 28, 1947, and was filed the following May 12th. Although this certificate is part of the general record of the case, it is no part of the trial record and will not be considered. *Warning v. Warning,* 5 Wn. (2d) 398, 105 P. (2d) 715.

Counsel seems to have also overlooked that appellant testified that he had an income of nineteen hundred fifty dollars in 1946, of which eleven hundred dollars was earned by the sale of flowers grown on the home property which the decree leaves in his possession.

The respondent testified that for some years she had been in ill health and unable to work full time, due, in part, to the fact that she was passing through the change of life, and, in part, to a rupture which occurred after the birth of her youngest child. She has, since 1935, been compelled to wear a specially built garment which has to be renewed about once a year at a cost of forty dollars, and has been advised that sooner or later the garment will not suffice and

an operation will be required. This testimony stands undisputed.

This court, in reviewing a divorce action, will not interfere with the property division ordered and decreed by the trial court, unless it appears from the entire record that it is clearly untenable or manifestly unreasonable, *Holm v. Holm*, 27 Wn. (2d) 456, 463, 178 P. (2d) 725. No such situation is shown in this case. In our opinion, the award to the respondent is fully justified. A much greater award would be in order if, in settling the account, it would be legally permissible to debit the appellant for depriving the respondent of her childhood and the joys and memories thereunto rightfully appertaining.

The respondent complains that the trial court wrongfully denied her post-trial motion for an allowance of attorney's fees to be used in the prosecution of this appeal. Respondent has not cross-appealed, and that ruling has, therefore, become final.

The decree appealed from will stand affirmed.

MALLERY, C. J., BEALS, STEINERT, and JEFFERS, JJ., concur.