195 P.3d 959 (2008)
In the Matter of the Marriage of Elizabeth A. URBANA, Respondent,
v.
Robert M. URBANA, Appellant.
No. 36260-1-II.
Court of Appeals of Washington, Division 2.
July 22, 2008.
Publication Ordered October 28, 2008.
*960 Mark Evan Didrickson, Attorney at Law, Vancouver, WA, for Appellant.
*961 Elizabeth Urbana, Battleground, WA, (Appearing Pro Se).
Juliet Carolyn Laycoe, Laycoe & Bogdon PC, Vancouver, WA, for Respondent.
VAN DEREN, C.J.
¶ 1 Robert Urbana appeals the trial court's division of the marital property in his dissolution from Elizabeth,[1] arguing that it erred when it awarded Elizabeth a disproportionate share because it prospectively awarded child support for their child, A.R.U., it considered his marital misconduct, and it required him to support his stepchildren. Holding that the trial court abused its discretion, we vacate and remand to the trial court for further proceedings consistent with this opinion.

FACTS

I. Marriage and Separation
¶ 2 Robert and Elizabeth were married on January 27, 1996. Elizabeth had two daughters from a prior marriage and Robert and Elizabeth had a son, A.R.U., born on May 21, 1996. Robert and Elizabeth separated in June 2005 because Robert allegedly assaulted his eldest stepdaughter. Soon thereafter, both stepdaughters alleged that Robert had sexually molested them. Robert was subsequently convicted of three counts of second degree child molestation and one count of third degree child molestation. And the trial court sentenced Robert to 100 months' incarceration.[2] The earliest date that Robert may be released from incarceration is December 20, 2011, when A.R.U. will be 15 years old.

II. Temporary Parenting Plan
¶ 3 When the parties separated, the trial court's temporary parenting plan required Robert to pay $254.00 per month as child support. At the time of the dissolution proceeding, he had paid only $27.00 and was $4,291.00 in arrears. Under the temporary parenting plan, Robert had residential time with A.R.U., but he failed to transfer A.R.U. properly back to Elizabeth and threatened Elizabeth in A.R.U.'s presence. Later the court terminated his contact with A.R.U.

III. The Family Home
¶ 4 When the couple married, they lived in Elizabeth's home in Portland until 1997, when they moved to Battle Ground, Washington. Before they moved, Robert performed some manual labor on Elizabeth's Portland home. Elizabeth netted $22,906.00 from the Portland home. The couple used those proceeds to pay community debts and to put $15,131.00 down on the Battle Ground home. Robert signed a quitclaim deed to Elizabeth when they purchased the Battle Ground home.[3] Later, Elizabeth opened a $15,000.00 home equity line of credit on the Battle Ground home that the couple used to pay off bills and for vehicle repairs. When Robert and Elizabeth separated, Elizabeth still owed $10,509.00 on the home equity line of credit and $107,880.00 on the original home loan.

IV. Elizabeth's Employment History
¶ 5 Elizabeth is employed by the City of Portland and earns a pension. In June 2001, Elizabeth quit her job and cashed out her entire pension, netting $53,458.00 after penalties and taxes, because the Battle Ground home was in foreclosure.[4] She used approximately $4,000.00 to resolve the foreclosure. The family also took a vacation to Disneyland and, when Elizabeth's pension money ran out, she returned to work for the City of Portland where she has remained continuously *962 employed.[5] Shortly after the parties separated, Elizabeth's pension plan was valued at $5,453.00.

V. Robert's Employment History
¶ 6 During the marriage, Robert worked sporadically as a painter. Prior to the couple's marriage, when Robert was in his early twenties, he had a driving accident and his fifth and sixth neck vertebrae were compressed. As a result, he has degenerative arthritis. During the marriage, Robert had surgery for a double hernia[6] and, after the surgery, his income dropped dramatically.
¶ 7 At the time of the dissolution proceeding, Robert was working while incarcerated and making $0.34 per hour for a maximum seven-hour day.[7] Statutorily, the Department of Corrections will allocate 15 percent of Robert's pay toward his child support obligation. RCW 72.09.111.[8]

VI. Other Financial Obligations
¶ 8 When the couple separated, they owed $500.00 on a credit card and $500.00 for vehicle repairs, $400.00 of which Elizabeth had paid off by the time of trial. Elizabeth also testified that Robert had written five checks that were returned for insufficient funds and that they owed $800.00 for mobile phone charges.

VII. Trial Court's Decision
¶ 9 The trial court ruled that the Battle Ground home was 87.9 percent community property and 12.1 percent Elizabeth's separate property. It found the fair market value of the home was $220,000.00. It subtracted the underlying mortgage of $108,000.00, leaving a net home value of $112,000.00. After applying the 87.9 percentage, it concluded that the value of the community portion was $98,448.00.
¶ 10 In reaching its decision on the property division, the trial court noted that Robert is currently incarcerated and had a record of sporadic employment during the marriage; whereas Elizabeth was steadily employed. It also stated that, while Elizabeth receives some child support for her daughters from her prior relationship, she will receive no support from Robert for A.R.U. The trial court also stated that it considered that, at or after the time of separation, Elizabeth discovered that Robert had been sexually abusing both of her daughters. The trial court concluded, "no child support order can be entered because [Robert] is unemployed. However, that factor does not have to be overlooked in the disposition of property in a divorce case such as this." Report of Proceedings (RP) at 114. It then awarded Elizabeth the Battle Ground home because she will be supporting herself and three children. In addition, it concluded that a fair and equitable division of the property, based on the parties' circumstances, was 20 percent of the community property to Robert and 80 percent to Elizabeth.
¶ 11 To determine the value and division of the community property, the trial court added the community home equity, $98,448.00, and Elizabeth's pension, $5,453.00, for a net community property value of $103,901. It then multiplied that net value by 20 percent, concluding that Robert was entitled to *963 $20,780.00. Then, the trial court subtracted Robert's child support arrearages of $4,291.00, one-half of Elizabeth's pension used to prevent foreclosure in 2001, $2,000.00, and one-half of the community debt at time of separation, $500.00. The trial court concluded that this left Robert with net community property of $13,989.00. At that point, Elizabeth raised the issue of the home equity line of credit. The trial court then reduced Robert's share by one-half of the outstanding balance on the home equity line of credit, leaving him $9,790.00, but asked counsel to check its calculations before entering the final order. In its final decree, the trial court awarded Robert $9,790.00. The trial court also found that "no child support obligation will be required" because Robert was incarcerated. But it ordered that if Robert "is released from prison prior to [A.R.U.] reaching age of majority, [Elizabeth] may petition the court to establish child support." Clerk's Papers (CP) at 81.
¶ 12 Robert unsuccessfully moved for reconsideration. In denying his motion, the trial court emphasized that in distributing the marital property, "[i]n terms of what is just, equitable and fair, the court may consider all circumstances of the marriage, both past and present, and an evaluation of the future needs of the parties." And it concluded that "[i]n making a distribution of property, the court should consider the responsibilities of raising the parties['] minor child and child custody [and the] post-dissolution circumstances of the wife, including her financial obligations to children born from another marriage." CP at 99-100.
¶ 13 Robert appeals.[9]

ANALYSIS
¶ 14 Robert argues that the trial court erred in awarding a disproportionate share of the community property to Elizabeth because it must have included prospective child support for A.R.U. and it failed to base any such calculation on the statutory child support calculation guidelines. He also argues that the trial court may not divide property based on marital misconduct, nor can it consider support for former stepchildren when considering future economic circumstances of the parties.

I. Standard of ReviewDisposition of Property
¶ 15 "A property division made during the dissolution of a marriage will be reversed on appeal only if there is a manifest abuse of discretion." In re Marriage of Muhammad, 153 Wash.2d 795, 803, 108 P.3d 779 (2005). A trial court abuses its discretion if its decision is manifestly unreasonable, based on untenable grounds, or based on untenable reasons. Qwest Corp. v. City of Bellevue, 161 Wash.2d 353, 369, 166 P.3d 667 (2007). While the trial court "is not required to divide community property equally," if its dissolution "decree results in a patent disparity in the parties' economic circumstances," we will reverse its decision because the trial court will have committed a manifest abuse of discretion. In re Marriage of Rockwell, 141 Wash.App. 235, 243, 170 P.3d 572 (2007).

II. Dividing Property at Dissolution
¶ 16 Robert notes that the trial court's findings and conclusions rely on case law that cites the former dissolution statute. When making the final just and equitable disposition of the marital property, the former dissolution statute, RCW 26.08.110 (1949), required the trial court to consider: (1) "the respective merits of the parties," (2) "the condition in which they will be left by such divorce or annulment," (3) "the party through whom the property was acquired," and (4) "the burdens imposed upon it for the benefit of the children." In 1973, the legislature enacted the new Dissolution of Marriage Act (Act), chapter 26.09 RCW. See Laws of 1973, 1st Ex.Sess., ch. 157.
¶ 17 RCW 26.09.080 replaced former RCW 26.08.110 and lists a nonexclusive set of factors that the trial court must consider when distributing the marital property. See Zahm, 138 Wash.2d at 218, 978 P.2d 498. The underlying purpose of that act was "`to replace the concept of fault and substitute marriage failure or irretrievable breakdown *964 as the basis for a decree dissolving a marriage.'" In re Marriage of Clark, 13 Wash. App. 805, 808, 538 P.2d 145 (1975) (internal quotation marks omitted) (quoting Hon. Nancy Ann Holman, A Law in the Spirit of Conciliation and Understanding: Washington's Marriage Dissolution Act, 9 Gonzaga L.Rev. 39 (1973)); see also In re Marriage of Little, 96 Wash.2d 183, 192, 634 P.2d 498 (1981) ("[T]he most significant [objective of the new act was] the rejection of fault as an element.").
¶ 18 When dividing the marital property, the trial court must consider "all relevant factors." Former RCW 26.09.080 (1989). This includes, but is not limited to:
(1) The nature and extent of the community property;
(2) The nature and extent of the separate property;
(3) The duration of the marriage; and
(4) The economic circumstances of each spouse at the time the division of property is to become effective, including the desirability of awarding the family home or the right to live therein for reasonable periods to a spouse with whom the children reside the majority of the time.
Former RCW 26.09.080.
¶ 19 These statutory factors are not limiting and the trial court may consider other factors such as "the health and ages of the parties, their prospects for future earnings, their education and employment histories, their necessities and financial abilities, their foreseeable future acquisitions and obligations, and whether the property to be divided should be attributed to the inheritance or efforts of one or both of the spouses." In re Marriage of Olivares, 69 Wash.App. 324, 329, 848 P.2d 1281 (1993); see also In re Marriage of Zahm, 138 Wash.2d 213, 218, 978 P.2d 498 (1999).
¶ 20 "A fair and equitable division by a trial court `does not require mathematical precision, but rather fairness, based upon a consideration of all the circumstances of the marriage, both past and present, and an evaluation of the future needs of the parties.'" Zahm, 138 Wash.2d at 218-19, 978 P.2d 498 (quoting In re Marriage of Crosetto, 82 Wash.App. 545, 556, 918 P.2d 954 (1996)). And although the trial court may not give a singular factor greater weight than another, "the economic circumstances of each spouse upon dissolution [are] of `paramount concern.'" Olivares, 69 Wash.App. at 330, 848 P.2d 1281 (quoting In re Marriage of DeRuwe, 72 Wash.2d 404, 408, 433 P.2d 209 (1967)). In a dissolution action, the trial court must make a "just and equitable" distribution of the marital property "without regard to marital misconduct." Former RCW 26.09.080.

III. Consideration of Child Support and Distribution of Property
¶ 21 Despite the public policy that parents cannot agree to waive child support, we have held that under the new Act "a disparate division of property may satisfy one spouse's child support obligations." In re Marriage of Hammack, 114 Wash.App. 805, 808, 60 P.3d 663 (2003); see also In re Marriage of Babbitt, 50 Wash.App. 190, 193, 747 P.2d 507 (1987); Holaday v. Merceri, 49 Wash.App. 321, 327, 742 P.2d 127 (1987). But in making such an award, the trial court must acknowledge that the property settlement is disproportionate because the trial court is awarding a portion of the property in lieu of future child support payments. See Hammack, 114 Wash.App. at 810-11, 60 P.3d 663; Babbitt, 50 Wash.App. at 193, 747 P.2d 507; Holaday, 49 Wash.App. at 327, 742 P.2d 127. The trial court must also quantify both the potential child support exposure during the child's minority and the parent's community property interest forfeited as an advance payment of child support. See Hammack, 114 Wash.App. at 811, 60 P.3d 663; Holaday, 49 Wash.App. at 327, 742 P.2d 127.
¶ 22 For example, in Holaday, Division One of this court held that the disproportionate division of property was a proper advance of child support payments. 49 Wash.App. at 326-27, 742 P.2d 127. It affirmed the trial court's ruling because "the court explained how [the disproportionate amount of community property] substituted for child support when invested at 10 percent interest[] and. . . the court inferred that changed circumstances may require additional support [in *965 excess of the disproportionate amount of community property]." Holaday, 49 Wash. App. at 327, 742 P.2d 127.
¶ 23 Contrary to Robert's assertion, under the new Act, the trial court may award a disproportionate share of the community property in lieu of future child support payments. See Hammack, 114 Wash.App. at 808, 60 P.3d 663. But here, the trial court abused its discretion by not stating the basis of its property division, by not stating whether it intended to substitute property for child support, and by not quantifying the amount of child support satisfied by the disproportionate property division in Elizabeth's favor.[10] Here, as in Hammack, the trial court made no effort to quantify Robert's potential child support obligations during A.R.U.'s minority. Furthermore, the trial court did not quantify the community interest Robert gave up and, therefore, no credit can be calculated. Instead, the trial court completely extinguished Robert's child support obligation, which we do not permit. See Hammack, 114 Wash.App. at 809-10, 60 P.3d 663.
¶ 24 Without findings of fact and conclusions of law allowing us to review the basis of its property division or quantify the value of property used to satisfy Robert's child support obligation, or to discern the trial court's intent with regard to child support, "the decree [has resulted] in a patent disparity in the parties' economic circumstances," and we must vacate the trial court's decree because it committed a manifest abuse of discretion.[11]Rockwell, 141 Wash. App. at 243, 170 P.3d 572.
¶ 25 We briefly address the following two issues because they are likely to arise on remand.

IV. Misconduct
¶ 26 Robert argues, "it is patently obvious that the court used the disproportionate award to punish the sex-offender husband." Br. of Appellant at 17. This argument is framed as one of misconduct, but is better articulated as an argument that the trial court abused its discretion by considering marital misconduct in dividing the community property.
¶ 27 "[M]arital misconduct which a court may not consider under RCW 26.09.080 refers to immoral or physically abusive conduct within the marital relationship and does not encompass gross fiscal improvidence, the squandering of marital assets or, . . . the deliberate and unnecessary incurring of tax liabilities." In re Marriage of Steadman, 63 Wash.App. 523, 528, 821 P.2d 59 (1991) (internal quotation marks and footnote omitted). Certainly, Robert's abusive physical and sexual conduct toward his two stepdaughters amounts to marital misconduct.
¶ 28 The Washington State Supreme Court recently considered a trial court's disproportionate award of community property in light of the trial court's comments about the wife obtaining a protection order against her husband that caused him to lose his job as a deputy sheriff. Muhammad, 153 Wash.2d at 804-05, 108 P.3d 779. The trial court noted that the wife "`sought to punish'" the husband and that she "had to `recognize the consequences' that were `taken into consideration *966 in terms of trying to make the distribution somewhat equitable.'" Muhammad, 153 Wash.2d at 805, 108 P.3d 779 (quoting Report of Proceedings (Jan. 24, 2002) at 2-4). The Court held that a number of aspects of the property division illustrated that the trial court went beyond looking at the parties' economic circumstances and impermissibly assigned fault to the wife for seeking an order of protection. Muhammad, 153 Wash.2d at 805, 108 P.3d 779.
¶ 29 Here, the trial court framed its findings in terms of the post dissolution economic circumstances of the parties, but commented on Robert's marital misconduct. For example, it found significant that Elizabeth "discovered that [Robert] had assaulted one of her daughters from a prior marriage and then later learned that [Robert] had molested both of her daughters from a prior marriage. [Robert] was sentenced for three counts of Child Molestation in the 2nd Degree and one count of Child Molestation in the 3rd Degree. [Robert] is presently incarcerated and his sentence is for 100 months." CP at 81.
¶ 30 This finding, considered in conjunction with an unexplained 20/80 percent split of community property, suggests that the trial court considered Robert's marital misconduct in dividing the property.
¶ 31 On remand, when distributing the marital assets, the trial court may consider the economic circumstances of the parties and the future earning potential of both Robert and Elizabeth. See former RCW 26.09.080(4); Rockwell, 141 Wash.App. at 248, 170 P.3d 572; Olivares, 69 Wash.App. at 329, 848 P.2d 1281. Furthermore, when calculating child support obligations, nothing requires the trial court to determine income solely on earned income or ignore a parent's other financial resources, such as dissolution awards, when one parent is incarcerated. See Blickenstaff, 71 Wash.App. at 498, 859 P.2d 646. But on remand, we caution the trial court only to consider the parents' economic circumstances and not to consider Robert's marital misconduct when distributing the marital assets.

V. Consideration of Support for Robert's Stepchildren
¶ 32 Robert argues that the trial court also abused its discretion in considering the necessity for Elizabeth to care for a family of four when awarding her a disproportionate amount of the community property because, in so doing, the trial court obligated him to provide support for his two stepdaughters.
¶ 33 A stepparent's obligation to support stepchildren terminates "upon the entry of a decree of dissolution, decree of legal separation, or death." Former RCW 26.16.205 (1990). And a commentator has opined, "[a]n important factor in determining future financial needs, of course, is reasonably anticipated future expenses. Where after the divorce one spouse lives with a child from another relationship, the decisions are split on whether the expenses of supporting the child are a division factor." Brett R. Turner, Blended Families in the 1990s: Property Division Issues Involving Nonmarital Children, 9 No. 6 Divorce Litig. 115, 119 (1997). Turner asserts that, despite the split of authority, "[i]n the absence of a duty of support, however, it is hard to see why a spouse with custody of nonmarital children should receive a larger property award." Turner, 9 No. 6 Divorce Litig. at 120. We agree and hold that, because the Washington legislature has clearly stated that a stepparent's duty of support terminates upon dissolution, any consideration of post-separation circumstances that include stepchildren must expressly exclude a division of property amounting to a transfer of property in lieu of child support for the stepchildren.
¶ 34 Here the trial court considered "[t]he post dissolution economic circumstances of [Elizabeth that] will require her to raise and support three children on her own." CP at 82. It is unclear what circumstances involving child support for A.R.U. and the stepchildren, if any, were contemplated by the trial court in its disproportionate property division, thus, on remand the trial court must clarify the basis and calculation of the property division and child support only for A.R.U.

*967 VI. Attorney Fees
¶ 35 Robert requests attorney fees on appeal. Under RCW 26.09.140, we have discretion to "order a party to pay for the cost to the other party of maintaining the appeal and attorney's fees in addition to statutory costs."
¶ 36 "The decision to award fees under RCW 26.09.140 is discretionary and must be based upon a consideration that balances the needs of the spouse seeking fees against the ability of the other spouse to pay." In re Marriage of Moody, 137 Wash.2d 979, 994, 976 P.2d 1240 (1999). Here, it is uncontested that Robert is incarcerated and earning $0.34 per hour. Elizabeth's financial circumstances are unknown; she did not file a brief because the original dissolution proceeding was expensive; she did not want to pay a lawyer on appeal; and she thought Robert's appeal was frivolous. But at the time of the dissolution, Elizabeth was gainfully employed. We do not find Robert's appeal frivolous and he prevails on appeal, but recognizing that Robert is incarcerated and, therefore, without the obligation to pay normal living expenses and that Elizabeth is caring for and providing for their child, we do not award fees to Robert.
¶ 37 We vacate and remand to the trial court for further proceedings consistent with this opinion.[12]
We concur: BRIDGEWATER, and QUINN-BRINTNALL, JJ.
NOTES
[1] In the dissolution decree, the trial court changed Elizabeth Urbana's name to Elizabeth Haynes. We refer to each party by their first name to avoid confusion; we intend no disrespect.
[2] Robert has been incarcerated since May 18, 2006.
[3] Robert testified that he signed the quitclaim deed because he had poor credit and they would not be able to obtain home financing with his name on the title. Elizabeth testified that she understood that, by Robert signing the quitclaim deed, he had no interest in the home. But when Robert cross-examined Elizabeth, she acknowledged that financing would have been more difficult had Robert not signed the quitclaim deed.
[4] Elizabeth testified that she had to cash out her entire pension, not just a portion of it.
[5] She testified that she wanted to attend Washington State University to obtain a bachelor's degree, but did not do so because Robert was unwilling to work. Robert testified that he was medically unable to work.
[6] The record is unclear when Robert had surgery. He testified that he had it in 2001, but he also testified that he had the surgery in 2004.
[7] Robert testified that the maximum amount he may earn is $0.34 per hour.
[8] RCW 72.09.111 provides in relevant part:

The secretary shall deduct taxes and legal financial obligations from the gross wages, gratuities, or workers' compensation benefits payable directly to the inmate under chapter 51.32 RCW, of each inmate working in correctional industries work programs, or otherwise receiving such wages, gratuities, or benefits. The secretary shall also deduct child support payments from the gratuities of each inmate working in class II through class IV correctional industries work programs.
. . . .
The formula shall include the following minimum deductions from class II[, class III, and class IV] gross gratuities:
. . . .
Fifteen percent for any child support owed under a support order.
[9] Elizabeth waived her right to file a respondent's brief.
[10] Robert also argues that the trial court erred in awarding Elizabeth a disproportionate share of the community property because it must have been using the equitable contribution doctrine. But, as Robert correctly notes, the trial court did not explain that it was applying this doctrine. Furthermore, this doctrine would not apply to this case because the trial court applies an equitable contribution theory retrospectively when the decree is silent on child support. See In re Marriage of Shoemaker, 128 Wash.2d 116, 123, 904 P.2d 1150 (1995).
[11] On remand, the trial court should consider RCW 26.19.065(2), which creates a rebuttable presumption of $25.00 per month in child support when the obligor's combined monthly net income is less than $600.00 per month. Furthermore, even though Robert will be incarcerated during the majority of A.R.U.'s minority, "[w]here the obligor has other means of paying his or her child support obligation, [such as with a community property distribution,] the trial court has the discretion to enforce the obligation even in the face of a total lack of income." In re Marriage of Blickenstaff, 71 Wash.App. 489, 498, 859 P.2d 646 (1993); see also State ex rel. Taylor v. Dorsey, 81 Wash.App. 414, 423-24, 914 P.2d 773 (1996) (the trial court, after calculating income, may require an incarcerated person to pay the minimum child support obligation).
[12] In addition, we note that some of the trial court's findings are inconsistent with the trial testimony. Furthermore, we are unable to determine how the trial court arrived at Robert's community property award of $9,790.00. We are unable to mathematically derive the resulting award. On remand, the trial court must clarify its calculations.