# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In re the Marriage of:<br><br>CRYSTAL H. TABLAZON,<br><br>                    Respondent,<br><br>        v.<br><br>ANTHONY J.M. TABLAZON,<br><br>                    Appellant. | No.  50025-6-II<br><br><br><br>UNPUBLISHED OPINION |

MELNICK, J. — Anthony J.M. Tablazon appeals from the trial court's order dissolving his marriage with Crystal H. Pak.[1]  He contends that the trial court erred by awarding Pak the family home, ordering him to pay her ten years of spousal maintenance, setting aside community assets to pay debts to Pak's family, and by awarding Pak attorney fees.[2]  Because the trial court abused its discretion by failing to value the community assets and awarding Pak one hundred percent interest in the family home, we reverse in part and remand for further proceedings.

## FACTS

### I.    MARRIAGE AND COMMUNITY PROPERTY

Pak and Tablazon married in 1989 and separated in September 2015.  At the time of their dissolution trial, they had two adult children.  Tablazon served in the Army until 2006.  He then worked as a private contractor for the United States State Department from 2006 until 2014.  Pak

---

[1] In the final divorce order, the trial court changed Crystal Tablazon's name to Crystal Pak.

[2] We also address Pak's request for attorney fees for this appeal.

worked as a hairdresser and homemaker. She started working when the kids began school and stopped in November 2013.

At the time of trial, both parties had Post Traumatic Stress Disorder (PTSD) and Tablazon was one hundred percent disabled but employable. Pak was not employable, but was being treated for her various mental disorders and could be employable in the future. Tablazon was unemployed at the time of trial, but testified that he had been seeking jobs. He received monthly combat-related specialty compensation (CRSC) payments from the military totaling approximately $5,800.

During their marriage, the parties resided in a house in Gig Harbor near Pak's family. After the separation, Pak resided in the house by herself. She continued the monthly mortgage payments of $1,800. The value of the home at the time of trial was either $380,000 or $385,000, and the Tablazons owed $105,000 on it.

During the marriage, Pak's sister, Kailani Kim, lent the parties money but did not keep a record of how much. At the time of trial, Pak and Tablazon owed her approximately $100,000. Pak transferred $30,000 to Kim several months before the parties separated. She transferred Kim another $20,000 several days after the separation. Pak's parents lent Pak and Tablazon approximately $70,000 during the marriage to purchase a home. Pak testified that she and Tablazon owed Kim at least $13,000 and owed her parents $70,000.[3]

During the marriage, the parties acquired another house from Tablazon's parents. Pak and Tablazon rented it out for a number of years until January 2015 when they sold it. Pak placed the $130,000 from the sale into an account to which only she had access.

---

[3] Pak listed the $70,000 from her parents as "inheritance" in a discovery response. 1 Report of Proceedings (RP) at 112. She testified that she answered this way because she "didn't know which way to explain it." 1 RP at 112.

Pak testified that Tablazon was physically and emotionally abusive to her throughout their marriage. This abuse caused her a rotator cuff injury, terminal ringing in her eardrums, PTSD, and other psychological disorders which prevented her from working.

II.    LITIGATION

Pak filed a petition for dissolution of marriage in December 2015.

A.    TABLAZON'S LITIGATION CONDUCT

In March 2016, as part of the dissolution proceedings, the court granted an ex parte restraining order preventing Tablazon from having contact with Pak for 14 days. In April, it extended the restraining order, ordered Tablazon to pay Pak monthly maintenance by direct deposit, and required Tablazon to pay taxes on the family home.

The following October, Pak did not receive her monthly payment and instead received an e-mail from "Popmoney"[4] asking her to set up an account to get her money. To create the account and receive her payment, she would have had to enter personal information, including her bank account.

In a November declaration, Tablazon stated:

I have been making the required spousal maintenance payments . . . as directed by this Court. I am still not clear why the bank chose to use a "Pop Money" account for purposes of depositing money into [Pak's] account, but once I learned that this had occurred, I went into the bank and made sure that the direct deposit that had previously been set up was continued.

Ex. 43.

At trial, Tablazon testified that he had placed a time limit on the direct deposit to Pak's account and, when it expired, a bank representative told him Popmoney would be the quickest way

---

[4] Popmoney is a service that allows users to send, request, and receive money through a cell phone app. www.popmoney.com/index.html. It allows for direct transfers between users' bank accounts and charges a flat fee per transaction. www.popmoney.com/index.html.

to get Pak the money without contacting her. When asked on cross-examination about his statement that he was "still not clear why the bank chose to use Popmoney," he stated, "[i]t was not a true statement" and attributed this misrepresentation to his depression and counseling at the time. 2 Report of Proceedings (RP) at 238.

Tablazon's trial testimony also contradicted numerous other declarations he had executed. In a declaration from April 2016, he stated he had been medically discharged from the army in 2006, but at trial he stated he had retired and that his declaration statement had been incorrect. Tablazon stated in the same declaration that he had left his civil contractor job because it "became too much for [him] physically and mentally; and [he] was unable to continue working in that position." Ex. 41, at 2. He also said he had taken a job as an operator at Bangor but "this became too much for [him] and [he] ha[d] not sought employment since." Ex. 41, at 2. He said that "[a]t this point, employment is just not possible." Ex. 41, at 2. At trial, Tablazon acknowledged that these statements were not true. He said he had left the first job because "of what [was] happening with [his] family back home" and that it was not true that the second job had been too much for him. 2 RP at 224. He also stated that he had been seeking employment for more than six months at the time of trial.

Tablazon also failed to respond to discovery requests sent in May 2016 until the following November. He stated this delay occurred because he was involved in PTSD counseling and was "in the very low end of [his] life ever." 1 RP at 190. At the time of trial, January 10, 2017, he had not paid the $1,000 attorney fee judgment against him that was due December 13, 2016. He claimed he did not know he had to pay it and did not remember being ordered to do so.

During the litigation, Tablazon removed Pak as the beneficiary of his military Survivor Benefit Plan and replaced her with his daughter. He made this change despite a court order

enjoining him from "assigning, transferring, borrowing, lapsing, surrendering or changing entitlement of any insurance policies." Ex. 23, at 3. He had no explanation for making this substitution. He said he changed the beneficiary back to Pak when his lawyer told him to do it.

## III. DISTRIBUTION OF ASSETS

The trial court issued findings of fact and conclusions of law and entered a final order dissolving the marriage. It ordered that the family home, subject to its mortgage, be awarded to Pak. It awarded each party all interest in various accounts and insurance policies in their own name. It also awarded each party one half of Tablazon's Thrift Savings Plan and his military retirement pension.[5] It awarded each of them their respective vehicles, household goods and furnishings in their possession, and any property they had accumulated since the separation. It awarded title to the parties' children's vehicles to Pak. The trial court did not value the community property on the record.

The trial court ordered Tablazon to pay Pak monthly spousal support for a period of ten years. It also ordered Tablazon to pay fifty percent of Pak's attorney fees and costs, totaling $28,585.49, because of his intransigence. Tablazon appeals.

---

[5] In awarding Pak fifty percent of Tablazon's retirement, the trial court noted that Tablazon had chosen to accept disability payments in lieu of military retirement and that it could not award Pak any share of Tablazon's disability payments. Though Pak would receive fifty percent of the retirement funds if and when Tablazon claimed them, the court observed that Tablazon "may choose never to claim his retirement which, again, is his right; so that is something the Court cannot factor in as a real asset being given to Mrs. Tablazon at this juncture." Clerk's Papers (CP) at 11.

ANALYSIS

I.    DISTRIBUTION OF COMMUNITY ASSETS[6]

Tablazon contends that the trial court abused its discretion by awarding Pak the family home because it was the primary asset of the parties.  He also claims that the court abused its discretion by "offsetting" $130,000 in Pak's personal bank account with various community debts to Pak's family and Tablazon's credit card.  We agree on the first contention but not the second.

A.    LEGAL PRINCIPLES

"'A property division made during the dissolution of a marriage will be reversed on appeal only if there is a manifest abuse of discretion.'"  *In re Marriage of Urbana*, 147 Wn. App. 1, 9, 195 P.3d 959 (2008) (quoting *In re Marriage of Muhammad*, 153 Wn.2d 795, 803, 108 P.3d 779 (2005)).

In dissolution proceedings, the trial court shall, "without regard to misconduct, make such disposition of the property and the liabilities of the parties . . . as shall appear just and equitable after considering all relevant factors."  RCW 26.09.080.   A non-exclusive list of factors the court shall consider includes:

> (1)  The nature and extent of the community property;
> (2)  The nature and extent of the separate property;
> (3)  The duration of the marriage or domestic partnership; and
> (4)  The economic circumstances of each spouse or domestic partner at the time the division of property is to become effective, including the desirability of awarding the family home or the right to live therein for reasonable periods to a spouse or domestic partner with whom the children reside the majority of the time.

---

[6] Tablazon challenges numerous findings of fact.  We review challenged findings of fact to determine whether they are supported by substantial evidence.  *Sunkidd Venture, Inc. v. Snyder-Entel*, 87 Wn. App. 211, 215, 941 P.2d 16 (1997).  Where conclusions of law are erroneously labeled as findings of fact, we review de novo and determine if the conclusions flow from the findings. *Robel v. Roundup Corp.*, 148 Wn.2d 35, 43, 59 P.3d 611 (2002).

RCW 26.09.080. The trial court may also consider other factors such as:

> "[T]he health and ages of the parties, their prospects for future earnings, their education and employment histories, their necessities and financial abilities, their foreseeable future acquisitions and obligations, and whether the property to be divided should be attributed to the inheritance or efforts of one or both of the spouses."

*Urbana*, 147 Wn. App. at 11 (quoting *In re Marriage of Olivares*, 69 Wn. App. 324, 329, 848 P.2d 1281 (1993)). The trial court need not make formal findings on the factors, so long as it is evident from the record that it actually considered all relevant factors. *In re Marriage of Steadman*, 63 Wn. App. 523, 526, 821 P.2d 59 (1991).

"The valuation of property in a divorce case is a material fact. The trial court is required to value the property to create a record for appellate review." *In re Marriage of Greene*, 97 Wn. App. 708, 712, 986 P.2d 144 (1999) (internal citation omitted). If the court does not do so, "the appellate court may look to the record to determine the value of the assets." *Greene*, 97 Wn. App. at 712. However, "if the values are in dispute, we are unable to determine whether the property division is just and equitable and must remand to the trial court." *Greene*, 97 Wn. App. at 712.

A fair and equitable distribution "'does not require mathematical precision, but rather fairness, based upon a consideration of all the circumstances of the marriage, both past and present, and an evaluation of the future needs of parties.'" *Urbana*, 147 Wn. App. at 11 (quoting *In re Marriage of Zahm*, 138 Wn.2d 213, 218-19, 978 P.2d 498 (1999)). "[A]lthough the trial court may not give a singular factor greater weight than another, 'the economic circumstances of each spouse upon dissolution [are] of paramount concern.'" *Urbana*, 147 Wn. App. at 11 (quoting *Olivares*, 69 Wn. App. at 330). "If the decree results in a patent disparity in the parties' economic circumstances, a manifest abuse of discretion has occurred." *In re Marriage of Rockwell*, 141 Wn. App. 235, 243, 170 P.3d 572 (2007).

"In a long term marriage of 25 years or more, the trial court's objective is to place the parties in roughly equal financial positions for the rest of their lives." *Rockwell*, 141 Wn. App. at 243. In a longer marriage, it is "more likely a court will make a disproportionate distribution of the community property. Where one spouse is older, semiretired, and dealing with ill health, and the other spouse is employable, the court does not abuse its discretion in ordering an unequal division of community property." *Rockwell*, 141 Wn. App. at 243.

In dividing property, the trial court may not consider marital misconduct, such as "'immoral or physically abusive conduct within the marital relationship.'" *Urbana*, 147 Wn. App. at 14 (quoting *Steadman*, 63 Wn. App. at 528).

B.     AWARD OF FAMILY HOME

Tablazon contends that the trial court abused its discretion by awarding the family home entirely to Pak since it was "the primary asset of the parties." Br. of Appellant at 7.

In *Urbana*, the trial court awarded the wife the family home because she would be supporting herself and three children while the husband was in prison. 147 Wn. App. at 8. It determined that a fair and equitable division of property, based on the parties' circumstances, would be twenty percent to the husband and eighty percent to the wife. *Urbana*, 147 Wn. App. at 8. It then calculated the total value of the community assets, including the value of the home, and awarded the husband twenty percent, minus his share of various community debts and unpaid child support. *Urbana*, 147 Wn. App. at 8. The court partially based its mathematically unequal division on the husband's inability to pay child support because he was in prison. *Urbana*, 147 Wn. App. at 8.

The court of appeals reversed this property division as an abuse of discretion because the trial court failed to state "whether it intended to substitute property for child support, and by not

quantifying the amount of child support satisfied by the disproportionate property division." *Urbana*, 147 Wn. App. at 12-13. *Urbana* also warned the trial court on remand not to consider the husband's sexual abuse of the wife's daughters in dividing the community property, suggesting that this may have been the explanation for its "unexplained 20/80 percent split." 147 Wn. App. at 15.

In *Rockwell* there was no abuse of discretion where the trial court divided community property of the parties 60/40 in its dissolution of a "long term marriage of 25 years or more." 141 Wn. App. at 243. The court considered the length of the marriage and the disparity in age, health, and employability of the parties. *Rockwell*, 141 Wn. App. at 243, 249.

The home in this case was worth between $380,000 and $385,000. At the time of trial, the parties owed $105,000 on it. The trial court awarded all interest in the home to Pak. It found that "[t]he home is situated very close to her family," that "[s]he is the one that raised the children in that location," and that she "has substantial ties not only to the location but to the home and her family." Clerk's Papers (CP) at 25. Tablazon testified that the home was his "sanctuary," but the court ruled that "it cannot be more of a sanctuary to him, since he was deployed substantially throughout his marriage, than it can be to her." 1 RP at 142; CP at 25.

The trial court also considered Tablazon's employability and Pak's lack of employability. It considered the parties' respective actions throughout the marriage, finding that Tablazon had "served his country well and supported his family well throughout th[e] marriage," and that Pak's actions "afforded Mr. Tablazon the opportunity to acquire sergeant major status in the United States Army." CP at 24-25.

Although Tablazon was employable and Pak was not, much of the trial court's reasoning in awarding Pak spousal support was based on this disparity. The trial court awarded one hundred

9

percent interest in the family home, with approximately $280,000 in equity, to Pak, without offering Tablazon any property in compensation.

We find nothing in the record to indicate that the trial court valued the community property in its dissolution ruling as it was required to do. It awarded each party various accounts in their own respective names and divided one of Tablazon's accounts and his military retirement benefits equally between them. It awarded Pak full interest in the home and Alex's and Jazmin's vehicles. Given the lack of valuation, we cannot calculate what percentage of community property the trial court awarded to each party. We are also unable to ascertain what percentage the home comprised of the total community property. Accordingly, we remand to the trial court to value the community property and equitably divide the property between the parties.

C.     COMMUNITY DEBT

Tablazon contends that the trial court erred by "offsetting" the $130,000 Pak received from the sale of Tablazon's parents' home with $130,000 worth of community debts to Pak's family and on Tablazon's credit card. Tablazon assigns error to the trial court's finding of fact regarding the existence of the debts to Pak's family. We address both Tablazon's factual challenge to the existence of the community debt and his claim that Pak "secreted" the $130,000 from the sale of his parents' home.

"[F]actual determinations will be accepted if they are supported by substantial evidence in the record." *Sunkidd Venture, Inc. v. Snyder-Entel*, 87 Wn. App. 211, 215, 941 P.2d 16 (1997). "'Substantial evidence exists if the record contains evidence of sufficient quantity to persuade a fair-minded, rational person of the truth of the declared premise.'" *In re Marriage of Griswold*, 112 Wn. App. 333, 339, 48 P.3d 1018 (2002) (quoting *Bering v. SHARE*, 106 Wn.2d 212, 220, 721 P.2d 918 (1986)).

10

At trial, Kim testified that she had paid more than $50,000 in debts owed by Tablazon and Pak. She also testified that her parents had lent about $70,000 to Pak and Tablazon to purchase a home. Pak testified that the $50,000 she transferred to Kim was intended to pay back money Kim had loaned her and Tablazon to pay off other debt during the marriage. Pak also testified that her parents loaned her and Tablazon $70,000 to purchase their house in Gig Harbor. Pak listed the $70,000 from her parents as "inheritance" in a discovery response, but testified this was because she "didn't know which way to explain it." 1RP at 112. Tablazon testified that he did not know about the loans from Kim and said there would have been no reason for Pak to borrow money.

There is a "general presumption that a debt incurred by either spouse during marriage is a community debt." *Sunkidd Venture, Inc.*, 87 Wn. App. at 215. This presumption may be overcome "by clear and convincing evidence that the debt was not contracted for community benefit." *Sunkidd Venture, Inc.*, 87 Wn. App. at 215. Tablazon does not suggest that any evidence exists that these debts were not the community's.

The trial court found that the parties' community debt consisted of $50,000 owed to Kim, $70,000 owed to Pak's parents, and several other items.[7] Substantial evidence supported these findings. We affirm the trial courts findings as to the community debt.

Tablazon emphasizes that Pak "secreted" $130,000 from the sale of his parents' home into her separate bank account. Br. of Appellant at 7. The money from this sale went to pay community debts. Where the parties "disposed of an asset before trial, the court simply has no ability to distribute that asset at trial." *In re Marriage of White*, 105 Wn. App. 545, 549, 20 P.3d 481 (2001). Here, the $130,000 had all been spent prior to the parties' dissolution, leaving the trial court no

---

[7] The trial court found that Tablazon used the remaining $10,000 from the sale of the home to pay his credit card debts during the dissolution. Because Tablazon does not challenge this finding, we do not address this portion of the trial court's ruling.

money to distribute. The trial court did not err by failing to distribute money that was no longer a community asset.

## II.    SPOUSAL MAINTENANCE

Tablazon contends that the trial court erred by awarding Pak spousal maintenance for ten years. He argues that "some award of spousal maintenance might have been appropriate," but that "it should be for no more than five years." Br. of Appellant at 9. He contends that Pak has the ability to work but has chosen not to, and that a shorter term of spousal maintenance would provide Pak incentive to return to work.[8]

In determining whether to award spousal maintenance to a party, the trial court shall order "such amounts and for such periods of time as the court deems just, without regard to misconduct, after considering all relevant factors." RCW 26.09.090(1). The statute requires the court to consider the following non-exclusive factors:

> (a)   The financial resources of the party seeking maintenance, including separate or community property apportioned to him or her, and his or her ability to meet his or her needs independently, including the extent to which a provision for support of a child living with the party includes a sum for that party;
> (b)   The time necessary to acquire sufficient education or training to enable the party seeking maintenance to find employment appropriate to his or her skill, interests, style of life, and other attendant circumstances;
> (c)   The standard of living established during the marriage or domestic partnership;
> (d)   The duration of the marriage or domestic partnership;
> (e)   The age, physical and emotional condition, and financial obligations of the spouse or domestic partner seeking maintenance; and
> (f)   The ability of the spouse or domestic partner from whom maintenance is sought to meet his or her needs and financial obligations while meeting those of the spouse or domestic partner seeking maintenance.

RCW 26.09.090(1).

---

[8] Tablazon does not assign error to the trial court's finding that Pak "is not employable at this time." CP at 7. Accordingly, it is a verity on appeal. *Cuesta v. Emp't Sec. Dep't*, 200 Wn. App. 560, 570, 402 P.3d 898 (2017).

In determining whether to award spousal maintenance, the trial court "exercises broad discretionary powers. Its disposition will not be overturned on appeal absent a showing of manifest abuse of discretion." *In re Marriage of Washburn*, 101 Wn.2d 168, 179, 677 P.2d 152 (1984). "The only limitation on the amount and duration of maintenance under RCW 26.09.090 is that the award must be 'just.'" *In re Marriage of Wright*, 179 Wn. App. 257, 269, 319 P.3d 45 (2013). "An award that does not evidence a fair consideration of the statutory factors results from an abuse of discretion." *In re Marriage of Spreen*, 107 Wn. App. 341, 349, 28 P.3d 769 (2001).

In *Wright*, the court did not abuse its discretion by awarding maintenance to the wife where she "would not work and [the husband] would retire in 2.5 years at the soonest." 179 Wn. App. at 269. It also ruled that "the trial court has discretion to award both an unequal property division and maintenance in favor of the same spouse." *Wright*, 179 Wn. App. at 269.

In this case, the trial court had difficulty evaluating Tablazon's income given his own failure to provide the court with accurate information. It found, based on the information it had available, that Tablazon was likely to make approximately $83,000 to 85,000 annually. The court was clear that Tablazon was employable and Pak was not. The court considered that the parties had been in a long term marriage of over twenty-five years. It also considered the parties' respective ages, education, training, and ability to work. As a result, it awarded Pak ten years of spousal support in the amount of $2,647.70, finding that Pak should be able to support herself within that timeframe.

The trial court did not abuse its discretion in ordering ten years of spousal maintenance.

III.    AWARD OF ATTORNEY FEES

Tablazon contends that the trial court erred by ordering him to pay 50 percent of Pak's attorney fees and costs. He claims that, because the court found that both parties had engaged in inappropriate behavior, it was improper for the court to award Pak fees on the basis of Tablazon's intransigence.

"Attorney fees are generally not awarded in a civil action unless authorized by statute, by agreement of the parties, or upon a recognized equitable ground." *In re Marriage of Greenlee*, 65 Wn. App. 703, 707, 829 P.2d 1120 (1992). RCW 26.09.140 provides authority for trial courts to award attorney fees in marriage dissolution proceedings. It provides:

> The court from time to time after considering the financial resources of both parties may order a party to pay a reasonable amount for the cost to the other party of maintaining or defending any proceeding under this chapter and for reasonable attorneys' fees or other professional fees in connection therewith, including sums for legal services rendered and costs incurred prior to the commencement of the proceeding or enforcement or modification proceedings after entry of judgment.

RCW 26.09.140.

Trial courts may also award attorney fees on the basis of intransigence of a party. *Greenlee*, 65 Wn. App. at 708. "'Awards of attorney fees based upon the intransigence of one party have been granted when the party engaged in foot-dragging and obstruction . . . or simply when one party made the trial unduly difficult and increased legal costs by his or her actions.'" *In re Marriage of Katare*, 175 Wn.2d 23, 42, 283 P.3d 546 (2012) (quoting *Greenlee*, 65 Wn. App. at 708). In this case, the attorney fee award Tablazon contests was based on both his intransigence at trial and his ability to pay.

An award of attorney fees is within the trial court's discretion. *In re Marriage of Mattson*, 95 Wn. App. 592, 604, 976 P.2d 157 (1999). The party challenging an award of attorney fees

14

"must show that the court used its discretion in an untenable or manifestly unreasonable manner." *Mattson*, 95 Wn. App. at 604.

In *Mattson*, the trial court did not abuse its discretion by awarding fees where the husband had "produced conflicting information about his income" and forced the other party "to conduct intense discovery, which increased her legal bills." 95 Wn. App. at 605. Even though the trial court did not use the word "intransigence," it did find that Mattson was "voluntarily underemployed, which constitute[d] intransigence." *Mattson*, 95 Wn. App. at 605. *In re Marriage of Bobbitt* decided that the trial court abused its discretion by awarding fees where it "made no findings about the attorney fee award," but "merely stated that $10,000 in attorney fees was awarded 'for the necessity of having to pursue this action.'" 135 Wn. App. 8, 30, 144 P.3d 306 (2006).

The trial court in this case found that, even at the conclusion of trial, Tablazon had not provided the court with a full financial disclosure, making it extremely difficult for the court to distribute the community property. The court also observed that Tablazon's statements about the Popmoney transfer of spousal support were "not forthright with the Court" and this was "one of a number of those issues" that the court had seen. CP at 30. It also found that Tablazon had the ability to pay. Tablazon acknowledged at trial that statements in his sworn declarations to the court were not truthful.

The trial court noted that it believed Pak was partially responsible for delays in the case and observed that she had opened an account in only her name without Tablazon's knowledge. It then awarded Pak fifty percent of her attorney fees on the basis of Tablazon's intransigence, rather than the one hundred percent she had requested, based on her own actions. This totaled $28,585.49.

15

The trial court also found that Pak had "incurred fees and costs, and needs help to pay those fees and costs" and that Tablazon had "the ability to help pay fees and costs." CP at 11. It did not make a finding as to how much money Tablazon had, nor did it note any source in the record supporting its finding that Tablazon had the ability to pay the fees and costs. However, when "'intransigence is established, the financial resources of the spouse seeking the award are irrelevant.'" *Greenlee*, 65 Wn. App. at 708 (quoting *In re Marriage of Morrow*, 53 Wn. App. 579, 590, 770 P.2d 197 (1989)).

The trial court did not abuse its discretion by awarding Pak fifty percent of her attorney fees and costs.

III.     ATTORNEY FEES ON APPEAL

Pak requests attorney fees for this appeal. She claims that she is entitled to fees both based on Tablazon's intransigence and on her need and Tablazon's ability to pay. Because Pak has not filed an affidavit of financial need with this court, we consider only her request for fees on the basis of Tablazon's intransigence. *See* RAP 18.1(c).

RCW 26.09.140 provides that "the appellate court may, in its discretion, order a party to pay for the cost to the other party of maintaining the appeal and attorneys' fees in addition to statutory costs." The court may also "award attorney fees and costs based on intransigence of a party, demonstrated by litigious behavior, bringing excessive motions, or discovery abuses." *In re Marriage of Wallace*, 111 Wn. App. 697, 710, 45 P.3d 1131 (2002). Intransigence includes obstruction and foot dragging, filing repeated unnecessary motions, or making the proceedings unduly difficult and costly. *Bobbitt*, 135 Wn. App. at 30. If one spouse's intransigence caused the spouse seeking a fee award to require additional legal fees, the financial resources of the spouse

16

seeking fees are irrelevant. *Morrow*, 53 Wn. App. at 590. "[A] party's intransigence in the trial court can also support an award of attorney fees on appeal." *Mattson*, 95 Wn. App. at 606.

In *Wallace*, the husband deliberately failed to provide complete financial records, fraudulently or grossly negligently wasted community assets, and fraudulently transferred property to his family members to deprive the wife of her interest in the property. 111 Wn. App. at 702-03. The court granted the wife fees on appeal because the husband had "demonstrated his intransigence at trial" and his appeal thus justified a fee award for the wife. *Wallace*, 111 Wn. App. at 710.

*In re Marriage of Buchanan* denied fees on appeal because the party against whom fees were sought had "succeeded in part on appeal" and had "not demonstrated intransigence" before the appellate court, despite his intransigent conduct at trial. 2009 Wash. App. LEXIS 1111, at *11, 207 P.3d 478, 483.

In addition to the specific bases for intransigence the trial court found in this case, Tablazon also admitted that he lied in several sworn declarations to the trial court. He was unresponsive to Pak's discovery requests and failed to pay a fee award within the trial court's 60-day deadline. He also removed Pak as beneficiary of his survivor benefit plan, despite a court order enjoining the parties from "assigning, transferring, borrowing, lapsing, surrendering or changing entitlement of any insurance policies of either or both parties whether medical, health, life, or auto insurance." Ex. 23 at 3.

Like the husband in *Buchanan*, Tablazon has succeeded in part on appeal and has not demonstrated any intransigence before this court. Accordingly, we decline to award Pak attorney fees for the appellate proceedings.

We reverse the trial court in part and remand for a valuation of the community property and an equitable distribution.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for the public record in accordance with RCW 2.06.040, it is so ordered.

_____
Melnick, J.

We concur:

_____
Maxa, C.J.

_____
Lee, J.