**FILED**
**JULY 28, 2022**
**In the Office of the Clerk of Court**
**WA State Court of Appeals Division III**

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Marriage of | ) | |
| | ) | No. 37878-1-III |
| CINDY D. SCINTO, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| and | ) | UNPUBLISHED OPINION |
| | ) | |
| JOHN P. SCINTO, | ) | |
| | ) | |
| Appellant. | ) | |

FEARING, J. (lead opinion) — In this marital separation case, John Scinto appeals the superior court's property division and the award of spousal maintenance and attorney fees to his wife, Cindy Scinto. The appeal primarily forces this court to examine the elasticity of discretion afforded a superior court when awarding property to separating spouses. John complains that the trial court abused its discretion when it allocated 79.2 percent of the couple's assets to his wife, Cindy. This opinion awkwardly presents the majority view on affirming the superior court's spousal maintenance award and award of attorney fees to wife Cindy Scinto, but the minority view on affirming the trial court's property division. Because of the unique circumstances of this case, including Cindy's severe medical ailments, her inability for gainful employment, and her need for the

family residence, I would hold that the superior court did not abuse its discretion. The majority holds otherwise.

## FACTS

John and Cindy Scinto married in 1982 in New York. They separated for the third time in June 2017. For reasons underscored later, the parties seek a legal separation, not a marital dissolution. Trial occurred in September 2019.

In 1989, when domiciling in Arizona, Cindy and John Scinto bore a son, later diagnosed to be on the autistic spectrum. The child, now an adult, resides on his own.

Since their marriage, John Scinto has worked for the United States Postal Service. Between 1982 and 1988, John labored as a mail carrier, first in North Carolina and then in New York. In 1988, the couple transplanted to Hereford, Arizona, where John worked as a distribution window clerk. He served in the same position at Sierra Vista, Arizona from 1989 to 1991.

From 1991 to 1996, John Scinto served as a postmaster, first in McNeal and later in Stanfield, Arizona. Beginning in 1996, John assumed the position of customer service analyst, a position in which he continues to serve at a higher level. In his first analyst position, he oversaw five hundred rural delivery routes in Arizona. He scrutinized routes to create and preserve proper sizing. This analysis demanded following contractual provisions, handbooks, and manuals and interfacing with rural communities.

John and Cindy Scinto moved, with their son, to Spokane in 1998, where John continued as a customer service analyst. All three have resided in Spokane since. In 2000, John received a promotion to retail delivery analyst, in which position he evaluated city delivery routes for eastern Washington and Idaho. His tasks included assessing the amount of time a carrier spent on a route and the amount of time that the carrier should have spent on the route.

At some unremembered time, John Scinto received another promotion, this time to retail fleet leader. John analyzed mail counts and city delivery routes. With assistance from computer software, John determined the most efficient methods to deliver mail. He supervised others who walked postal routes and who reported to him numbers that he, in turn, reviewed.

In 2006, John Scinto became an operation specialist with the United States Postal Service, at which time he journeyed to Washington, D.C. on temporary assignment. John developed policies and programs regarding rural delivery. He updated Postal Service manuals. Cindy and the couple's son continued to live in Spokane, and John periodically returned home. John continues employment with the Postal Service today as a rural delivery specialist working from Spokane.

At the time of trial, John Scinto accrued a monthly salary of $9,636, paid biweekly. This salary equates to yearly income of $115,633. The Postal Service monthly deducts $59 for Medicare and $669 for civil service retirement from John's paycheck.

3

He claims his net monthly income is $7,200 after also deducting for income taxes. John also monthly deducts an amount from his paycheck into a voluntary retirement plan known as a thrift savings plan.

Cindy Scinto's physical condition overshadows other factors in this appeal. Cindy suffers from relentless health problems requiring constant monitoring and resulting in high medical expenses. The ailments include a heart transplant attended to coronary artery disease, a pancreas transplant caused by type 1 diabetes, Graves' disease with labile thyroid levels, osteopenia, recurrent kidney stones, chronic kidney failure and disease, sleep apnea, recurrent skin carcinoma due to the effects of immunosuppressant treatment for the transplants, and actinic keratosis.

Cindy Scinto has endured diabetes since childhood. At a young age, she began injecting herself with insulin through needles. She developed carpal tunnel syndrome because the diabetes contributed to numbness and pain in her wrists and fingers. Because of the diabetes, Cindy encountered a difficult pregnancy with the couple's son, and her physician placed her in the hospital for the last two months of pregnancy. Cindy needed six months to recover from continued swelling after childbirth.

Cindy Scinto's pregnancy resulted in a hormonal imbalance, which increased her blood sugar imbalance. After the Scintos moved to Spokane, surgeons removed Cindy's uterus and ovaries. Cindy took estrogen for an unidentified time, which did not assist in balancing her hormones or blood sugar.

To end the practice of injecting herself with needles, Cindy Scinto acquired, at an unidentified time, an insulin pump. She changes the pump's catheter every three days.

Grave's disease is an autoimmune disorder that impacts the thyroid. On an unknown date, a surgeon removed Cindy Scinto's thyroid as a result of the disease.

Cindy Scinto develops trigger fingers, an immune system response to synovial tissue in her hands. The infirmity renders her fingers stiff and locked. Some surgeries have ameliorated this finger ailment, but trigger fingers return on occasion. When a finger sticks, she struggles to pry open the digit.

In 2001, son Jonathan and Cindy were jogging for his physical education instruction. Cindy suddenly developed cramps, pain in her legs, and breathlessness. Her chest felt crushed by an elephant. Cindy visited her family physician. An echocardiogram, blood work, and blood pressure showed no abnormality. The physician sent Cindy home with a diagnosis of acid reflux.

Three days later Cindy Scinto visited the emergency room at a Spokane Valley hospital. The hospital immediately conveyed Cindy to Sacred Heart Medical Center in Spokane. At the medical center emergency room, medical personnel performed a nuclear treadmill test. A cardiologist diagnosed a large blockage in Cindy's left anterior descending artery, known as a widow maker. Personnel quickly carted Cindy to the surgery theater, wherein a surgeon implanted stents.

On numerous later occasions, surgeons installed stents in arteries surrounding Cindy Scinto's heart. Cindy received eleven stents. Additional blockage soon followed the placement of each of the stents. Cindy underwent an angioplasty with the addition of each stent. Recovery from each surgery required three days in the hospital. Cindy had a pacemaker implanted in her heart.

Despite receiving the various heart surgeries, doctors determined that Cindy Scinto needed a heart transplant, and she was placed on the transplant list. One does not receive a transplant unless close to death. A cardiologist told Cindy she was near death, although seventy individuals possessed higher priority on the transplant list. On July 14, 2005, a Seattle donor died, but no heart surgeon wanted to relocate the donor's heart because the donor suffered a viral cancer called cytomegalovirus from drug use. The donor also smoked tobacco. Surgeons questioned whether the heart would benefit anyone. Being near death, Cindy asked for the donor's heart. A Leer jet flew the heart from Seattle to Spokane. The transplant lasted six hours. Cindy remained in intensive care for two weeks. Her recovery lasted one year. Her breathing improved from the transplant, however.

An organ transplant cultivates new ailments. The transplant patient must medicate with anti-rejection drugs. Because of the diseased substitute heart donated to Cindy Scinto, cancer manifested itself in four months after the transplant. Cindy underwent chemotherapy.

6

Cindy Scinto also developed skin cancer on her nose. Prednisone taken for the heart transplant had thinned her skin. A surgeon removed one side of Cindy's nose and removed the cancerous cells before regrafting the nose skin. Cindy thereafter underwent chemotherapy on her face for the skin cancer. Cindy developed skin cancer in other areas of her body. Skin cancer on her shinbone area demanded the removal of a chunk of flesh and forty stitches.

After heart surgery, Cindy Scinto encountered difficulty measuring her blood sugar level. Medications for the heart transplant prevented her body from absorbing insulin. Also, insulin did little to balance Cindy's blood sugar level.

One day in 2011, Cindy Scinto became delusional and went into shock. Because of complications with diabetes resulting from the heart transplant, Cindy then needed a pancreas transplant. She went to the Mayo Clinic for assistance, but the clinic refused to operate because of her earlier heart transplant. Cindy returned to Spokane. She later learned that European surgeons travel to the University of Illinois in Chicago and perform risky surgeries. Cindy went to Chicago for a pancreas transplant. European surgeons drive a hard bargain. Before the surgery, Cindy signed a release stating she faced a zero percent chance of survival. She remained in downtown Chicago until the availability of a pancreas donation. She recovered in Chicago for a month after the transplant.

Two years after the pancreas transplant, Spokane practitioners refused to provide follow-up care for Cindy's pancreas. Seattle physicians also refused to administer checkups. Cindy then traveled to Tucson for checkups. Years later the pancreas treating physician moved from Tucson to Tampa, where Cindy now travels.

Cindy Scinto boasts that she is the first person in the world to receive both a heart and a pancreas transplant. The two transplants have further compromised Cindy's immune system. She must avoid areas contaminated with viruses and bacteria. She has contracted pneumonia since the last transplant. The pneumonia landed Cindy in a hospitalization isolation ward. The ailment required frequent removal of fluid from the lungs and intravenous medications.

Cindy Scinto submits to follow-up examinations of her heart every three months. Each year she undergoes angioplasty. She has had bypass surgeries since the transplant. During one surgery, the surgery team broke Cindy's sternum. She later needed additional surgery to rewire the sternum.

On an unidentified day in December 2013, Cindy Scinto felt movement in her shoulder. The pacemaker, which had not been removed during the heart transplant, had become dislodged and moved toward Cindy's lungs. The Scintos then lived separately, so Cindy drove herself to the emergency room. A surgeon removed the pacemaker on the following day.

In addition to taking anti-rejection medications for both transplants, Cindy Scinto uses medications to improve her immune system. The latter drugs bring side effects, such as sweating, shakes, and nausea. The medications damage Cindy's kidneys. Cindy gathers kidney stones too large to pass on her own. Because of Cindy's surrogate pancreas, physicians employ unique procedures to remove the stones.

At the time of trial, Cindy Scinto experienced forty percent blockage in her heart's main artery. Surgeons cannot fix the blockage such that her life span may be short.

At trial, Cindy Scinto had needed new glasses for one year, but lacked funds to purchase them. She requires complicated lenses, which raise the price of glasses to as high as $250.

Cindy weekly visits a counselor for anxiety and depression.

Because of the use of steroids, Cindy Scinto's teeth crack. She needed braces. In 2018-19, she paid $2,607 for braces. At trial, Cindy needed a new tooth and bridges, at a cost of $10,000.

Through employment with the United States Postal Service, John Scinto provides medical insurance with Blue Cross Blue Shield for Cindy and the couple's son. Still, Cindy must pay copays for medications and doctor visits. She pays $5,000 in copays each year. After a family member incurs $5,000 for in-network care, the Blue Cross Blue Shield policy pays for all later expenses in the policy year. Cindy reaches this catastrophic amount each year.

9

The Blue Cross Blue Shield policy affords limited dental and eye coverage. Cindy's dentist submitted the cost of braces to the medical insurance company, and the company denied coverage. Cindy lacks coverage for much of her dental treatment. The medical insurance company initially refused to pay for her counseling.

One or more of her physicians directed Cindy to obtain a gym membership for needed exercise. She monthly pays for a gym membership. John Scinto allowed a family gym membership to lapse after Cindy's filing of the legal separation petition.

In December 2018, Cindy Scinto lacked money to pay for medications. John would not pay. She raised $1,400 by Facebook for the medications.

During John Scinto's rise in the United States Postal Service structure, Cindy worked as homemaker and caregiver for the couple's son. She homeschooled the autistic son. In the last decade, Cindy has worked part time performing computer graphics with a ministry in Coeur d'Alene and Post Falls and penning articles. Cindy accrues only nominal income. Cindy Scinto cannot gain employment because of her medical condition and unending medical appointments. She formerly wrote on a freelance basis but can no longer do so because of the condition of her hands.

In his spare time, John plays the guitar in a band. He earns a small amount of income for music performances, but his expenses always exceed the income. John owns numerous pieces of musical and sound equipment.

Since the filing of the separation petition, Cindy Scinto has resided in the family residence. She wishes to continue to live in the home for financial, physical, and emotional reasons. A realtor estimates the value of the home to be $285,000. The couple owes no debt against the residence. John now lives in an apartment above a garage and pays monthly rent in the amount of $1,475.

Under Postal Service employment rules, the service pays the employee for accumulated leave time at the time of separation from employment. At the time of trial, John Scinto had accumulated leave valued at $34,880.

PROCEDURE

This appeal arises from the third filing between the parties. John Scinto filed for marital dissolution in 2013. John filed for dissolution again in 2017. Both cases were dismissed. Cindy filed this proceeding as a legal separation in 2017.

Under a 2018 temporary order, John Scinto paid Cindy $2,500 per month in spousal maintenance pending trial. The order did not require that John pay any medical expenses.

John Scinto procured a restraining order against Cindy because of her publishing defamatory comments online and interfering with John's business relations. Cindy sent a message to one of John's fellow band members that suggested the band expel John. She wrote that John turned her life into a nightmare. On her Facebook page, Cindy expressed

11

outrage toward John. The restraining order prevented Cindy from referencing John on

social media or in any publication and from attending his musical performances.

After entry of the restraining order and after a mediation of the proceeding, Cindy

Scinto wrote to a nephew of John:

> Your uncle and I went to mediation yesterday. He would not meet me half way. What he offered was leave me penniless and with no where [sic] to live. . . .
> . . . .
> . . . Your uncle insisted on a divorce but he's holding it up with lies and by not submitting paperwork. I'm broke. Will run out of money for my anti rejection medication. This is shortening my life. It's not fair to Jonathan either to lose his mom.
> Doesn't anyone in this family care?

Clerk's Papers (CP) at 182-83. In a second e-mail to the nephew, Cindy wrote:

> All I wanted was my half of the assets and alimony to live on. Just what I'm supposed to get. But he refuses. And he has plenty of money. I'm sitting in my living room with gloves on because I have the temperature down to 62.

CP at 182.

At trial, John Scinto argued that the message to the nephew violated the restraining

order and a confidentiality provision in the mediation agreement. John asked that the

restraining order continue after entry of the order of legal separation. Cindy denied the

need for a continuing order and argued that she would not engage in similar messages in

the future. She explained that the message arose from her experiencing posttraumatic

stress disorder. At trial, she was under care for the disorder.

At the opening of the trial, Cindy Scinto requested leave of the trial court to amend the request for legal separation to a prayer for marital dissolution. The court denied the amendment because of the lack of a formal motion. John testified that he had agreed to a legal separation so that Cindy could maintain health insurance.

During the trial, the parties announced an agreement that John would share fifty percent of the community portion of his retirement pension with Cindy. Cindy also asked the court to divide John's income until he retires.

During the trial testimony of Cindy Scinto, the superior court asked counsel about the parties' respective wishes for disposing of the family residence. Cindy's counsel requested possession of the residence and a nominal payment of $4,534 to John for his share in the home. John's counsel bade the court to split the equity in half. The superior court then requested the attorneys to ponder and later address the legality and possibility of awarding Cindy a life estate with John retaining ownership of a one-half interest in the abode. The court remarked:

> I don't even know what the legality of that is. Neither party requested that and so perhaps my hands are tied without a motion from a party, but—perhaps it's not, though. It could be that I have wide enough discretion to consider that in deliberations, but I'm putting it out there so it's not hidden from the parties, and I'd like some discussion of it in this trial.

Report of Proceedings (RP) at 198.

13

During closing argument, the following colloquy transpired between the superior court and Cindy Scinto's counsel regarding the court's earlier inquiry about a life estate for Cindy in the residence:

> So to answer the Court's question in short, I do think you have the legal authority to issue a life estate. I think that that may create more problems when you do that to the resolution of this case.

RP at 423.

> THE COURT: . . . tell me again your specific concern if the Court were to hypothetically grant a life estate with reversion back to Mr. Scinto in the event that Ms. Scinto preceded him in death.
> MR. HUGHES [Cindy's counsel]: Certainly. There's a couple of issues. I think that we would have to figure out what portion of her property to be distributed to her estate, and what portion is his property to be distributed to his estate.
> THE COURT: What if the Court's hypothetical is simply to grant her a life estate with a 100 percent reversion back to Mr. Scinto at the end of her life, and if Mr. Scinto doesn't survive her, then it would revert to her?
> MR. HUGHES: I think that in the event that she predeceased him that the value of the home . . . is double what Mr. Scinto is requesting in equalization. So in that scenario he would have received essentially double the equalization and would be a windfall. The reverse scenario I think would be something of windfall to Ms. Scinto[,] if she were to predecease [him,] she would have a zero amount that would be paid to him. That would be closer to a 73 percent distribution of assets to her should he predecease. So I would think that if you granted a life estate with an offset of equality of the total value, we would have to say if either party predeceased X amount would be reverted to each estate of the other party. I think that analysis would in the end be similar to the analysis of trying to sort of figure out what the payment would be and Ms. Scinto's position having heard the Court's question and talking through that if the Court finds that evidence would be 4,000, 50,000, 80,000 or 120,000, if you find a number that's an equalization payment, I believe that the law gives this Court authority to say she will pay back his interest X amount a month and

14

this is how it would be secured. I think that would make clear the issue as to what Mr. Scinto's interest is and what her interest is and then that amount can be—can be otherwise accommodated.

If the Court was to think it creates potential issues between the estates of both parties and likely between parties that are not party to this case that are then going to take issue relative to this Court's judgment here in the form of an estate because Ms. Scinto's estate would probably have issue with that, I'm assuming Mr. Scinto would like to have issue with that should he be deceased.

RP at 428-29.

During closing, John Scinto's counsel asked the superior court to award Cindy the home, but require Cindy to obtain a loan against the home and pay the proceeds of the loan to John as an equalization payment. Counsel rejected the superior court's suggestion of a life estate because neither party could access the equity in the home until Cindy's death. According to John's counsel, Cindy should sell the home and purchase a cheaper condominium. Cindy could thereby access some of the equity in the home.

After closing statements by counsel, the superior court recessed the trial for six weeks before announcing his ruling. The sparse written findings of fact incorporate the court's oral ruling, so we quote the ruling at length.

The Court is to put the parties in the financial position they would be in if they remained married taking into account a number of factors including the community property and both parties' earning potential. Again, this is a long-term marriage that makes this Court's task very difficult in this case, but nevertheless, the Court did its best to comply with the statutes and case law which require this Court to take into account both parties' past earning potential, future earning potential, their age, and their physical characteristics. In this case, it was particularly complicated because [Cindy Scinto], to this Court's satisfaction, it was proven that she

15

really did not have the ability based on her extensive medical conditions which are complicated [sic] the ability to earn much income. Historically she had not earned much income, and the Court found her testimony credible that she doesn't have an ability to earn any significant income due to her health concerns going forward in time. Substantial evidence persuaded me to this finding.

I do find that she's disabled for the purposes of earning potential. I do find that she's disabled, and although there was testimony that she had earned some money here and there, the speaking engagements, being an author, or a part-time writer, the Court nevertheless continues to find that she's not in a position to be a significant earner for herself due to her extensive healthcare concerns.

RP at 449-50.

The superior court valued the couple's Greenacres residence at $290,000 and awarded the house to Cindy Scinto. The court awarded personal community property to Cindy in the amount of $108,853.50 and personal community property to John in the amount of $105,060.50. Including the real property award, the trial court awarded $398,853.50 or 79.2 percent of the community property assets to Cindy and $105,060.50 or 20.8 percent to John. The trial court declared:

The reason for the disproportionate award in this case, this is the parties' primary community asset [the residence], is due to the circumstances of the nature of their lifestyle during the marriage. Essentially, [John Scinto] has been employed by and has had a healthy financial career with the U.S. Postal Service. . . . He's had steady employment throughout the marriage. [Cindy] essentially was a stay-at-home parent for much of the child's life and has not really been in a condition to be an income earner. Her earning potential has been significantly limited by her extensive medical issues that were articulated in the substantive evidence here. She's had a heart transplant. She's had a litany of medical conditions which the Court found to be credible and proven to this Court's satisfaction by a preponderance of the evidence.

16

The Court feels a disproportionate award is necessary in this case due to her lack of earning potential as well as the fact that this was a long-term marriage, and her own contribution from being a stay-at-home mother and homemaker contributed to [John's] ability to advance his career and earn income. The Court is tasked with making a fair, just, and equitable distribution of property to put the parties in the position they would be in if they remained married. Knowing that the request from [Cindy] was the Court split the income, I was not inclined to do so in that fashion. So the Court is awarding the real property in its entirety on any and all equity. There is no debt associated with that real property.

RP at 451-52. The superior court commented about other ways to dispose of the

couple's residence:

I do want you to know I looked at other options that whether a trust could be set up, whether a life estate should be granted. I looked at things upside down to try to make sure that both parties were in a fair and just position and this what I came up with, this is what I think is the best resolution given the fact it's a long-term marriage.

RP at 478.

The superior court uttered oral findings in favor of a maintenance award:

I am going to order maintenance in this case, and I'm going to make a lifetime maintenance order. The Court rarely does so, but the Court finds it appropriate given the long-term nature of the marriage being 35 years. The Court also considered all the factors enumerated in RCW 26.09.090. That includes the financial resources of the party seeking maintenance, including any separate or community property apportioned to her, as well as both parties' abilities to meet their own needs independently.

The Court also considered the time, any necessary time to acquire sufficient education and training to enable the party seeking maintenance to find appropriate employment based on her skills, interest, lifestyle, and other attendant circumstances. In this case, considering that factor the Court finds that it is not practical for [Cindy Scinto] to be an earner for herself due to the extensive medical conditions she has. Historically that

17

was also the case, she was never a significant earner during the lifetime of the marriage.

The Court also considered the standard of living that was established during the marriage. And, again, the Court tries to do its best with the limited resources available to give the parties the ability to live a lifestyle that was close to that experienced in the marriage and finds that's fair, just, and equitable.

Again, the Court also considers the late age, the physical and emotional conditions of both parties and the financial obligations of the wife, who is seeking maintenance; again, noting her lack of ability to earn income and his ability to earn income through his both historic and during trial his continued stability in his career earning over six figures.

The Court also considered the ability of [John] in this case to meet his own financial obligations as well as meeting those of the spouse who was seeking maintenance and her ability to meet her own needs. The Court considered all factors enumerated in RCW 26.09.090 and finds that a lifetime maintenance award of $2,300 per month going forward is appropriate.

The Court also has concerns regarding her ability to acquire medical insurance, so that's another reason why this Court in addition to the factors enumerated in .090, the Court also has concerns about that. I think, frankly, even with the disproportionate award and even with the lifetime maintenance award, she may have difficulty securing the appropriate medical insurance or the medical out of pocket and/or medical necessities that she may need. However, this Court can't create assets out of nowhere, and the Court has to account for [John's] right to live a life that's somewhat close in proximity to the life that he lived during the marriage, and so the Court finds that $2,300 is sufficient plus the disproportionate award with respect to the home is fair, just, and equitable in its totality. And although that may not meet every need of [Cindy], the Court nevertheless finds it is fair, just, and equitable and is the most this Court would order in terms of lifetime maintenance. I find a maintenance above and beyond this, such as a splitting of the income would be unfair to [John] and would also deprive [John] of having an existence that was close in proximity to the marriage. So $2,300 will be the maintenance, lifetime maintenance award.

RP at 453-55.

John Scinto's counsel informed the superior court that John's Postal Service pension would pay between $6,000 and $8,000 per month. Counsel also reminded the court that the parties had agreed to equally share the monthly pension benefit. In response, the court remarked:

> I will indicate that if under any contingency that her [Cindy's] share of the retirement, once it goes into effect, drops below [$]2,300, he [John] will have to at least get her to [$]2,300 in maintenance. That is fair, just, and equitable.

RP at 476.

During its oral ruling, the superior court addressed the possibility that either John or Cindy Scinto would transform the legal separation proceeding to a marital dissolution and the effect of a dissolution on Cindy's ability to afford medical care. John represented that he would not seek a dissolution so that Cindy could retain health insurance. The court commented:

> It has been represented that [Cindy Scinto] was going to convert this to a dissolution, which she has every right to do. The Court took into account in the maintenance award that most likely if this turns into a dissolution, she may not be able to meet her medical needs with a $2,300 maintenance award even considering the disproportionate award. However, the Court is aware of the equity position that [John Scinto] has indicated he's not seeking dissolution for the purposes of her maintaining her medical insurance and the Court took that into account to a certain degree. And so if she seeks a dissolution that will be granted, that may put her in financial strain if she's not able to essentially acquire affordable medical insurance. However, that really is her choice to do and it would be unfair for this Court to obviously force her to do that. She has every right and public policy would support her ability to seek a dissolution once she meets the statutory criteria in the 90 days of that one, she files appropriately.

RP at 477.

The superior court awarded Cindy Scinto attorney fees to be paid by John:

> The Court has determined that [John Scinto] shall pay $15,000 of [Cindy Scinto's] attorney's fees, offset by the amount [John] had to pay to obtain the restraining order against [Cindy].
> [John] proved fees related to obtaining a restraining order against [Cindy] by providing invoices in the amount of $3,754.50.
> The Court therefore orders [John] to pay [Cindy's] attorney's fees in the amount of $11,245.50 payable to Hughes & Nelson, Attorneys at Law, PLLC, payable within 30 days of entry of this order or subject to entry of a judgment and/or garnishment/collection.

CP at 351.  The court added:

> With respect to the attorney fees in this case: the Court was mindful of attorney fees request and did apportion for that.  I'm going to indicate that [John Scinto] in this case will pay 15,000 in attorney fees and that will be offset by the precise amount with respect to the restraining order, the temporary restraining order, so I don't have an attorney fees calculation for that.  So the parties are instructed I'm awarding that [John is] to pay 15,000 in attorney fees to [Cindy] offset by the temporary, the amount to be reflected seeking the temporary restraining order.  So, Counsel, I guess I'll have to see a supplemental on that as to what that amount would be precisely, but I find that fair, just, and equitable.
> In looking at this case, I think both parties could have come to a resolution.  Even though one party has certainly a less earning potential, I also think that this case could have been settled so the Court has wide discretion to apportion attorney fees, so that's the extent to which I'm ordering [John] to assist with attorney fees in this case and her earning income.
> . . . .
> . . . It's based on the total assessment of equities in this case.  So I think some contribution from [John] to [Cindy] is warranted given his earning potential and her lack of earning potential.  But I also, again, I've offset that by the temporary—whatever attorney fees comprise and were needed related to the seeking and obtaining of the temporary restraining

order, and I'm not inclined to award any additional attorney fees above and beyond the [$]15,000 based in part on the assessment of all equities to include financial discrepancies of the parties in this case and this Court had also formed a perception that this case could have been settled out of court. Anyway, that's the Court's position on this.

I actually don't think the Court is required to articulate a reason when it distributes attorney fees given the statutes, just gives the Court wide discretion in that case, but, nevertheless, the Court considered all issues of equity.

RP at 462-63. John did not object to the attorney fee award.

LAW AND ANALYSIS

John Scinto assigns three errors to the superior court's rulings. First, the court erred when ordering spousal maintenance to continue after his retirement. Second, the court inequitably divided the couple's property. Third, the court erred when awarding Cindy reasonable attorney fees. I address the assignments in such order. Although this proceeding entails a legal separation, not a marital dissolution, the same rules with regard to spousal maintenance, a property division, and attorney fees apply. The Washington decisions I discuss entail dissolutions, formerly known as divorces.

Maintenance

The superior court ordered John Scinto to pay Cindy $2,300 per month until his retirement. Once John retires, John and Cindy, per agreement, will each receive half the value of John's United States Postal Service retirement pension income. If Cindy's receipt of retirement income falls below $2,300 a month, John must pay the difference as maintenance. On appeal, John argues that any maintenance obligation should end once

21

he retires and Cindy begins receiving 50 percent of the pension payments. John does not

challenge his paying $2,300 per month before his retirement. He does not complain

about Cindy receiving half of his retirement pay. He only complains about paying Cindy

the difference between $2,300 and her share of the retirement pay after he ceases

employment.

A trial court may award maintenance in a legal separation:

(1) In a proceeding for dissolution of marriage or domestic partnership, legal separation, declaration of invalidity, or in a proceeding for maintenance following dissolution of the marriage or domestic partnership by a court which lacked personal jurisdiction over the absent spouse or absent domestic partner, the court may grant a maintenance order for either spouse or either domestic partner. The maintenance order shall be in such amounts and for such periods of time as the court deems just, without regard to misconduct, after considering all relevant factors including but not limited to:

(a) The financial resources of the party seeking maintenance, including separate or community property apportioned to him or her, and his or her ability to meet his or her needs independently, including the extent to which a provision for support of a child living with the party includes a sum for that party;

(b) The time necessary to acquire sufficient education or training to enable the party seeking maintenance to find employment appropriate to this or her skill, interests, style of life, and other attendant circumstances;

(c) The standard of living established during the marriage or domestic partnership;

(d) The duration of the marriage or domestic partnership;

(e) The age, physical and emotional condition, and financial obligations of the spouse or domestic partner seeking maintenance; and

(f) The ability of the spouse or domestic partner from whom maintenance is sought to meet his or her needs and financial obligations while meeting those of the spouse or domestic partner seeking maintenance.

RCW 26.09.090.

An award of maintenance lies within the trial court's discretion. *In re Marriage of Vander Veen*, 62 Wn. App. 861, 867, 815 P.2d 843 (1991). Washington courts have approved awards of lifetime maintenance in a reasonable amount when the party seeking maintenance will not be able to contribute significantly to his or her own livelihood. *In re Marriage of Mathews*, 70 Wn. App. 116, 124, 853 P.2d 462 (1993).

In support of his contention that the superior court abused its discretion when awarding continuous spousal maintenance, John Scinto relies on numerous factual contentions, some which are irrelevant and some which are mistaken. John contends that the superior court cannot base spousal maintenance on some unforeseen future event. Presumably this unforeseen event is his pension payment dipping below a total of $4,600 per month. At the same time, John underscores that no evidence suggests that Cindy will ever receive less than $2,300 per month. We agree. In fact, John's counsel represented to the superior court that Cindy will never receive less than $3,000 per month as her share of Postal Service retirement benefits. John does not explain why he frets about an event he insists will never occur and appeals a ruling that will never impact his behavior.

John Scinto emphasizes that he will not receive any income other than his retirement pay when ending employment. Therefore, assuming both he and Cindy receive less than $2,300 per month from the Postal Service, Cindy will continue to receive that amount, while his income falls according to his paying Cindy the shortfall.

Again, his counsel claimed this scenario would never occur. Anyway, John fails to note that he could gain other employment, after retirement from the Postal Service, to supplement his pension. Cindy cannot probably gain gainful employment.

John mentions that Cindy will receive $500 per month in Social Security payments, while he will receive none. He asks this court to rely on these facts when reviewing the maintenance award. Nevertheless, John failed to cite to the record for the purported facts. RAP 10.3 governs the content of a brief on appeal. RAP 10.3(a)(5) demands that any "[r]eference to the record must be included for each factual statement." This reviewing court need not search the record for applicable portions supporting a party's arguments. *Mills v. Park*, 67 Wn.2d 717, 721, 409 P.2d 646 (1966). Therefore, we do not consider how receipt of Social Security benefits, or the lack of receipt, impacts the parties' respective welfare.

John Scinto writes in his brief that he nets $6,572 per month and, after paying rent of $1,475 per month and his other expenses, he incurs a deficit of $616 a month. The evidence does not support net income of $6,572 unless John deducts voluntary contributions to his thrift savings plan and some other unidentified expense. The evidence shows that John nets $7,200 each month. Like any other separating or divorcing couple, the parties cannot live as economically comfortable apart as they did together. Both John and Cindy may need to curtail spending in order to live within their respective incomes.

24

The trial court based its decision for spousal maintenance, if not its property allocation also, in part on future health expenses. John Scinto complains that the court entered no finding as to the amount of future expenses. Nevertheless, the undisputed evidence established that Cindy always reached the catastrophic yearly cap such that she annually paid $5,000 of unreimbursed expenses.

John Scinto also complains that the superior court erred in considering his retirement pension when determining the maintenance award. Nevertheless, the parties stipulated at trial that Cindy Scinto would receive one-half of John's pension income upon his retirement. John insists that Cindy will not receive less than $2,300 through her half of the pension payment. John will receive a credit for all of the pension payment against his $2,300 per month maintenance obligation. Thus, assuming the superior court relied on the value of the pension when calculating the maintenance sum, the reliance prejudiced John none. Regardless, the trial court entered no findings relating to the pension. The record does not reflect that the court considered the pension value or monthly payments when reaching a decision.

In the course of its oral ruling, the superior court pondered the potential impact of Cindy Scinto's ability to obtain health insurance on a later conversion of the proceeding from legal separation to marital dissolution. Six months following a decree of legal separation, either party may move the court for a mandatory conversion of the decree of legal separation to a decree of dissolution. RCW 26.09.150(2)(a). John Scinto

25

challenges the trial court's maintenance and property distribution orders to the extent the court predicated its ruling on this possible impact.

We disagree with John Scinto's reading of the superior court's comments with regard to transforming the legal separation decree to a dissolution. John pledged not to convert the decree. The trial court remarked that Cindy requested to convert the proceedings to dissolution at the outset of trial. In turn, the court noted that conversion to dissolution would jeopardize Cindy's insurance for medical expenses. The trial court warned that, if Cindy exercises her right to convert the proceeding to a dissolution, she causes herself financial harm. But the court did not express any intent to increase the maintenance award or property division in anticipation of such a possibility.

John Scinto principally relies on *In re Marriage of Mathews*, 70 Wn. App. 116 (1993), but misstates its holding. In *In re Marriage of Mathews*, this court found error when the trial court awarded indefinite maintenance equivalent to one-half of Donald Mathews' income to his divorcing spouse when a qualified domestic relations order already operated to transfer one-half of all retirement or disability income. This court found error when the combination of the two orders would have deprived Mathews of his half of the retirement income. *Mathews* does not stand for the proposition that a court is forbidden from awarding maintenance that extends beyond retirement.

John Scinto also relies on *Morgan v. Morgan*, 59 Wn.2d 639, 369 P.2d 516 (1962), wherein the Supreme Court reversed an alimony award based entirely on the

conjectural possibility that the wife might face future health problems. The Supreme Court's ruling does not prevent a trial court from considering a party's existing health problems when crafting a maintenance award. The Scinto separation court found Cindy suffered extraordinary physical ailments that prevented her from any gainful employment. The testimony and exhibits resoundingly supported this finding.

John Scinto does not provide any law demonstrating that the trial court's maintenance award constituted reversible error. He does not cite any law that precludes the superior court from awarding maintenance that results in the supporting spouse receiving less income than the needy spouse. He does not argue in the abstract that $2,300 in monthly spousal maintenance is unfair.

The trial court considered the RCW 26.09.090 factors in crafting the maintenance award, including the parties' abilities to earn income, standards of living, ages, and physical conditions. We discern no abuse of discretion.

Property Division

John Scinto next challenges the superior court's division of the couple's property as unfair because Cindy received 79.2 percent of the value of the assets. John particularly complains that the court awarded Cindy the family residence without any equalization payment to him. Again, this opinion constitutes the minority view.

RCW 26.09.080 governs division of property in a legal separation:

> In a proceeding for dissolution of the marriage or domestic partnership, legal separation, declaration of invalidity, or in a proceeding for disposition of property following dissolution of the marriage or the domestic partnership by a court which lacked personal jurisdiction over the absent spouse or absent domestic partner or lacked jurisdiction to dispose of the property, the court shall, without regard to misconduct, make such disposition of the property and the liabilities of the parties, either community or separate, as shall appear just and equitable after considering all relevant factors including, but not limited to:
> (1) The nature and extent of the community property;
> (2) The nature and extent of the separate property;
> (3) The duration of the marriage or domestic partnership; and
> (4) The economic circumstances of each spouse or domestic partner at the time the division of property is to become effective, including the desirability of awarding the family home or the right to live therein for reasonable periods to a spouse or domestic partner with whom the children reside the majority of the time.

The listed factors are not exclusive and a court may consider other factors, including the health and ages of the parties, their prospects for future earnings, their education and employment histories, their necessities and financial abilities, their foreseeable future acquisitions and obligations, and whether the property to be divided should be attributed to the inheritance or efforts of one or both spouses. *In re Marriage of Urbana*, 147 Wn. App. 1, 11, 195 P.3d 959 (2008). The court should ponder all the circumstances of the marriage, both past and present, and evaluate the future needs of parties. *In re Marriage of Crosetto*, 82 Wn. App. 545, 556, 918 P.2d 954 (1996). The economic circumstances of each spouse on dissolution hold paramount concern. *In re Marriage of DeRuwe*, 72 Wn.2d 404, 408, 433 P.2d 209 (1967); *In re Marriage of Urbana*, 147 Wn. App. 1, 11 (2008).

An equitable division does not require mathematical precision. *In re Marriage of Zahm*, 138 Wn.2d 213, 218-19, 978 P.2d 498 (1999). On the one hand, the superior court need not divide community property equally as long as the award is fair considering all circumstances of the marriage. *In re Marriage of Doneen*, 197 Wn. App. 941, 949, 391 P.3d 594 (2017). On the other hand, if the dissolution decree results in a patent disparity in the parties' economic circumstances, this court will reverse the decision because the trial court will have committed a manifest abuse of discretion. *In re Marriage of Urbana*, 147 Wn. App. 1, 10 (2008); *In re Marriage of Rockwell*, 141 Wn. App. 235, 243, 170 P.3d 572 (2007). Importantly, in a long-term marriage of twenty-five years or more, the trial court should place the parties in roughly equal financial positions for the rest of their lives. *In re Marriage of Rockwell*, 141 Wn. App. 235, 243 (2007). The longer the marriage, the more likely the court will make a disproportionate distribution of the community property. *In re Marriage of Rockwell*, 141 Wn. App. at 243. When one spouse is older, semiretired, and dealing with ill health, and the other spouse is employable, the court does not abuse its discretion in ordering an unequal division of community property. *In re Marriage of Rockwell*, 141 Wn. App. at 243. Future earning capacity is a substantial factor to be considered by the trial court in making a just and equitable property distribution. *In re Marriage of Hall*, 103 Wn.2d 236, 248, 692 P.2d 175 (1984).

29

The relative physical condition of the parties is a material consideration in rendering a property division. *Shay v. Shay*, 33 Wn.2d 408, 410, 205 P.2d 901 (1949); *Guarino v. Guarino*, 29 Wn.2d 314, 324, 186 P.2d 927 (1947). In *Shay v. Shay*, the Supreme Court approved a property allocation, over the objection of the husband, because of the wife's precarious medical condition that included hypertrophic cardiovascular disease.

We will reverse a property division made during the dissolution of a marriage only on a manifest abuse of discretion. *In re Marriage of Muhammad*, 153 Wn.2d 795, 803, 108 P.3d 779 (2005). We afford the superior court "broad discretion" in distributing the marital property. *In re Marriage of Rockwell*, 141 Wn. App. 235, 242 (2007). A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or untenable reasons. *In re Marriage of Littlefield*, 133 Wn.2d 39, 46-47, 940 P.2d 1362 (1997).

John Scinto principally relies on *In re Marriage of Urbana*, 147 Wn. App. 1 (2008). In *Urbana*, this court held that the superior court abused its discretion when awarding the husband twenty percent of the property and the wife eighty percent. Nevertheless, we ruled that the abuse of discretion arose from the superior court's failure to state the basis for the property division, not that the division was necessarily unfair. We remanded for the trial court to enter findings. *In re Marriage of Urbana*, 147 Wn. App. 1, 13 (2008).

Each dissolution must be decided on its unique facts. In *In re Marriage of Davison*, 112 Wn. App. 251, 258-59, 48 P.3d 358 (2002), this court affirmed the superior court's property allocation. Although the husband received half of the parties' total assets, he complained that he only received twenty-five percent of the community property. In *In re Marriage of Tower*, 55 Wn. App. 697, 701, 780 P.2d 863 (1989), this court affirmed the grant to one spouse of sixty-three percent of the property because of the unique circumstances.

I must agree with John Scinto that the superior court divided the marital property disproportionately. I may even agree that the superior court's allocation reaches the outer boundary of a court's discretion. Nevertheless, the division stayed within the border of reasoned discretion because of the remorseless physical infirmities that beset Cindy, her inability to work, her annual unreimbursed medical expenses, and the benefit resulting from her continued occupation of the marital residence. The property division may best permit the respective spouses to continue with a standard of living enjoyed before the separation.

No decision presents a mathematical formula for deciding a fair and equitable property division. No decision declares that the court may not award one spouse a percentage of property beyond a maximum figure. No case holds that an eighty percent allocation to one spouse necessarily exceeds the superior court's authority.

31

John Scinto highlights that Cindy need not pay a mortgage. Nevertheless, she will pay home insurance, property taxes, and maintenance on the residence. John will always garner more than Cindy's $2,300 per month spousal maintenance, which will permit him to pay rent or purchase a modest home.

The superior court may have possessed discretion to order that Cindy Scinto own one-half of the real property in fee simple and the other half as a life estate to return to John or his heirs on Cindy's death. The court asked the parties to comment on this possible division. Nevertheless, John did not ask for a life estate, but rather argued against the device. I observe that the couple's son is the only natural heir of both parties and will likely benefit from the home no matter who dies first. When neither party asks for a life estate and both parties argue against a life estate, a trial court does not abuse its discretion when denying the ownership vehicle.

John Scinto, in addition to and related to his contention that the superior court abused its discretion, maintains that the trial court entered insufficient findings of fact to facilitate appellate review of the property division. He requests remand for more specific findings by the trial court. A trial court's findings of fact must declare the ultimate facts that justify its conclusions. *In re Marriage of Tulleners*, 11 Wn. App. 2d 358, 369, 453 P.3d 996 (2019). The trial court found that Cindy Scinto faced a litany of health problems and would be unable to obtain income by her own efforts, but did not attempt to assign monetary values to these circumstances. These articulated findings indicate that

the trial court based the property division on permissible factors. John does not provide law suggesting that the trial court was required to submit findings with greater specificity.

Although John Scinto assigned error to the superior court's property allocation as fair, John assigned no error to underlying findings of fact lying within the court's oral ruling. We encourage counsel to draft numbered written findings that echo the superior court's oral ruling for more efficient review for this court. Nevertheless, we know of no reason to disregard findings emanating from an oral ruling. An appellate court may utilize the trial court's oral opinion to clarify formal findings. *In re Marriage of Yates*, 17 Wn. App. 772, 773, 565 P.2d 825 (1977). Unchallenged findings of fact are verities on appeal. *Rush v. Blackburn*, 190 Wn. App. 945, 956, 361 P.3d 217 (2015).

A majority of this panel encourages, but does not require, the trial court to amend the property award so it is less disproportionate. Along these lines, the majority repeatedly writes that the superior court "could have" ordered otherwise. But the majority never writes that the superior court "should have" ruled differently. If this court does not direct the superior court to amend its property division, this court concludes that the division may be fair. If the division may be fair, the superior court did not abuse its discretion.

### Attorney Fees

John Scinto argues that the superior court erred in awarding Cindy Scinto $15,000 in attorney fees, offset by the fees incurred by John in obtaining a restraining order

against Cindy for publicizing malicious statements about John. After the deduction, the court awarded Cindy the sum of $11,245.50.

The American Rule generally denies attorney fees to a party unless a contractual, statutory, or recognized equitable exception applies. *Dalton M, LLC v. North Cascade Trustee Services, Inc.*, 20 Wn. App. 2d 914, 941, 504 P.3d 834 (2022). RCW 26.09.140 authorizes the superior court to award a party fees in a legal separation proceeding. RCW 26.09.140 declares:

> The court from time to time after considering the financial resources of both parties may order a party to pay a reasonable amount for the cost to the other party of maintaining or defending any proceeding under this chapter and for reasonable attorneys' fees or other professional fees in connection therewith, including sums for legal services rendered and costs incurred prior to the commencement of the proceeding or enforcement or modification proceedings after entry of judgment.

Under RCW 26.09.140, the court should consider the need of the party requesting the fees, the ability to pay the fees, and the general equity of the fee given the disposition of the marital property. *In re Marriage of Van Camp*, 82 Wn. App. 339, 342, 918 P.2d 509 (1996). In determining fees, a court should also consider (1) the factual and legal questions at issue, (2) the amount of time spent preparing the case, and (3) the value of the property involved. *In re Marriage of Foley*, 84 Wn. App. 839, 846-47, 930 P.2d 929 (1997).

If the trial court makes an award, the court must state on the record the method it used to calculate the award. *In re Marriage of Ayyad*, 110 Wn. App. 462, 473, 38 P.3d

1033 (2002); *In re Marriage of Knight*, 75 Wn. App. 721, 729, 880 P.2d 71 (1994); *In re Marriage of Sanborn*, 55 Wn. App. 124, 130, 777 P.2d 4 (1989). Although this rule mentions only the calculation of the award and not the basis underlying the award, we conclude the same rule should apply in the context of the basis of the award. Under other circumstances, the trial court must furnish a record of its reasons for a decision in order to accommodate appellate review of the decision. *State v. Williams*, 87 Wn.2d 916, 920, 557 P.2d 1311 (1976); *Lawrence v. Lawrence*, 105 Wn. App. 683, 686, 20 P.3d 972 (2001).

The superior court followed the language of RCW 26.09.140 by considering the financial resources of the parties. In its oral ruling the court noted John Scinto's earning potential and Cindy Scinto's lack of earning potential. The court did not grant all of Cindy's incurred fees, because it deemed the case should have settled and because Cindy caused John fees by her defamatory statements. We recognize that the court did not cite to the statute and suggested it need not articulate a reason for the award. Nevertheless, no rule requires a citation to the statute as long as the court relies on the substance of the statute. The court articulated its reasons for the award and the amount.

Attorney Fees on Appeal

In the final sentence of her brief, Cindy Scinto requests attorney fees on appeal under RPC 18.1. We assume Cindy references RAP 18.1, which permits a party to request fees or expenses if applicable law grants the right to recover attorney fees or

expenses. RAP 18.1(a). Cindy fails to devote a section of her brief to the request for fees

or expenses as required by RAP 18.1(b). Therefore, we deny the request for attorney fees

on appeal. *Dalton M, LLC v. North Cascade Trustee Services, Inc.*, 20 Wn. App. 2d 914,

963 (2022).

CONCLUSION

We affirm the superior court's maintenance award and award of reasonable

attorney fees to Cindy Scinto. We reverse the property division and remand to the

superior court for further review of the property allocation. We deny Cindy an award of

fees on appeal.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

_____
Fearing, J.

No. 37878-1-III

LAWRENCE-BERREY, A.C.J. (concurring/majority) — We concur in that part of the lead opinion that affirms the trial court's $2,300 per month lifetime maintenance and attorney fee awards. What follows is the majority opinion concerning the property award.

John Scinto challenges the trial court's division of marital property. He argues that awarding Cindy Sinto 79.2 percent of the community property is not fair and equitable. We conclude the trial court manifestly abused its discretion because its findings are insufficient to justify such a patently disproportionate property award.

RCW 26.09.080 governs division of property in a legal separation:

[T]he court shall, without regard to misconduct, make such disposition of the property and the liabilities of the parties, either community or separate, as shall appear just and equitable after considering all relevant factors including, but not limited to:
    (1) The nature and extent of the community property;
    (2) The nature and extent of the separate property;
    (3) The duration of the marriage or domestic partnership; and
    (4) The economic circumstances of each spouse or domestic partner at the time the division of property is to become effective, including the desirability of awarding the family home or the right to live therein for reasonable periods to a spouse or domestic partner with whom the children reside the majority of the time.

The listed factors are not exclusive and a court may consider other factors, including the health and ages of the parties, their prospects for future earnings, their education and employment histories, their necessities and financial abilities, their foreseeable future

acquisitions and obligations, and whether the property to be divided should be attributed

to the inheritance or efforts of one or both spouses. *In re Marriage of Urbana*, 147 Wn.

App. 1, 11, 195 P.3d 959 (2008).

We will reverse a trial court's division of property in a legal separation only for a

manifest abuse of discretion. *See In re Marriage of Muhammad*, 153 Wn.2d 795, 803,

108 P.3d 779 (2005). We afford the trial court broad discretion in distributing the marital

property. *In re Marriage of Rockwell*, 141 Wn. App. 235, 242-43, 170 P.3d 572 (2007).

In a long-term marriage of 25 years or more, the trial court should place the

separating parties in roughly equal financial positions. *Id.* at 243. The trial court need

not divide community property equally as long as the award is fair. *In re Marriage of

Doneen*, 197 Wn. App. 941, 949, 391 P.3d 594 (2017). But if the property award results

in a patent disparity in the parties' economic circumstances, this court will reverse the

award because the trial court will have committed a manifest abuse of discretion. *See

Urbana*, 147 Wn. App. at 10; *Rockwell*, 141 Wn. App. at 243.

Here, the trial court indicated its intent to put the parties in the same financial

position, taking into account a number of factors. We do not think it accomplished this.

It awarded Cindy four times the property value it awarded John. In addition, it required

John to pay $2,300 per month in maintenance and $1,700 per month for his own housing

while Cindy enjoyed mostly free housing. These large disparities were only partly

2

reduced by setting John's maintenance obligation so his net income would be $2,600 more per month than Cindy.[1] On the whole, the court's property award placed John in a much worse financial position than it placed Cindy.

It is apparent from the trial court's decision that it sought to provide Cindy with an appropriate level of financial security. We affirm those aspects of the court's decision that achieve this purpose—lifetime maintenance of $2,300 per month, attorney fees through trial, and mostly free housing.

Cindy testified she wanted to live in the family home for financial, physical, and emotional reasons. The trial court did not abuse its discretion by allowing Cindy to live in the home. But it could have done so *and* given Cindy financial security without making such a patently disproportionate award.

For instance, the trial court could have awarded the $290,000 family home to Cindy, subject to a promissory note secured by a deed of trust in favor of John. The trial court could determine the amount of the promissory note, its interest rate, and make it payable upon the sale of the property or Cindy's death, whichever first occurs.[2] This

---

[1] Cindy was awarded $2,300 per month in maintenance. John's net income after paying Cindy's maintenance is $4,900 ($7,200 less $2,300). The difference between $4,900 and $2,300 is $2,600.

[2] Another option was to award John the family home subject to a life estate in favor of Cindy. This sound option was raised by the trial court. We disagree with the lead opinion's statement that John opposed this idea. John, in fact, was open to it.

3

would have achieved the trial court's purpose without making a patently disproportionate award.

John principally relies on *Urbana*. In *Urbana*, this court held that the trial court abused its discretion when it awarded the husband 20 percent of the property and the wife 80 percent. 147 Wn. App. at 8, 13. There, the husband was incarcerated for a long time and would have limited ability to pay child support while the wife raised the children. *Id.* at 5, 7-8. We surmised that the trial court's patently disproportionate property award was intended to offset the lack of child support the mother would receive. *Id.* at 12-13. We nonetheless vacated the award because "the trial court abused its discretion by not stating the basis of its property division, by not stating whether it intended to substitute property for child support, and by not quantifying the amount of child support satisfied by the disproportionate property division in [the mother's] favor." *Id.* We addressed issues that were likely to arise on remand, then vacated and remanded "for further proceedings consistent with this opinion." *Id.* at 17. We did not remand merely for entry of appropriate findings, as suggested in the lead opinion.

Similarly here, the trial court's findings are insufficient to justify the patently disproportionate property award. Sound options were available to ensure that Cindy's

---

Although he preferred the trial court to order the family home sold and the proceeds divided, he described the life estate as "not a terrible arrangement." Report of

No. 37878-1-III
*Marriage of Scinto* (concurring/majority)

financial needs would be met, short of making a patently disproportionate award. We vacate the trial court's property award and remand for the trial court either to enter particular findings explaining why a patently disproportionate award is fair and equitable despite alternative options; or, better yet, to implement an option that satisfies Cindy's needs and also achieves a fair and equitable division of property.

_Lawrence-Berrey, A.C.J._
Lawrence-Berrey, A.C.J.

I CONCUR:

_Knodell, J.P.T._
Knodell, J.P.T.

Proceedings at 431.

5